[Crim. No. 5658. In Bank. Apr. 28, 1955.]

THE PEOPLE, Respondent, v. HAROLD JACKSON et al., Appellants.

Valentine C. Hammack and Sidney Feinberg for Appellant Jackson.

Frances Newell Carr and Robert K. Winters for Appellant Lear.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, Raymond M. Momboisse, Deputy Attorney General, Thomas C. Lynch, District Attorney (City and County of San Francisco), and Norman Elkington, Assistant District Attorney, for Respondent.

EDMONDS, J.—Harold Jackson and Joseph Lear were tried jointly upon an indictment which charged that they kidnaped Leonard Moskovitz for ransom or reward, inflicting bodily harm upon the victim. A second count of the indictment alleged that they conspired to commit the crime and that they were armed with a deadly weapon when it was committed. Jackson's prior conviction of a felony was also pleaded. A jury found both men guilty as charged and made no recommendation as to the penalty.

The death sentence was imposed upon Jackson. The trial judge ordered "that the verdict of the jury be modified"

as to Lear and fixed his punishment at life imprisonment without possibility of parole. The automatic appeal by Jackson (Pen. Code, § 1239, subd. (b)), and Lear's appeal from the judgment and an order denying a motion for a new trial have been consolidated.

The evidence concerning these facts is without substantial conflict:

At the time of the asserted kidnaping, Leonard and his twin brother, Alfred, operated a real estate business, assisted in an advisory capacity by their father, Maurice Moskovitz. Both Leonard and Alfred were financially sound and free from pressing obligations. The members of the Moskovitz family were unacquainted with Jackson and Lear, except possibly for a business transaction between Jackson and the father several years previously.

On January 13th, the Wednesday preceding Leonard's abduction, Jackson called at Leonard's office and introduced himself as "Mr. Lund." He asked to see some real estate and arranged to do so upon the following weekend. On Saturday morning, he telephoned to Leonard and made an appointment to meet him a short time later at a designated location. When Leonard arrived, Jackson persuaded him to drive to a house where his wife and brother-in-law assertedly were waiting for them.

After they entered the house, Jackson ordered Leonard to remove his coat and then pushed him to a sitting position upon the couch. Jackson held his arms as Lear entered the room, brandishing a knife which he placed at Leonard's throat, saying, "One peep out of you and you are dead." Leonard's wrists and ankles were chained and his wallet and papers removed from his pocket. He was then told he was to be held captive until ransom in the amount of $500,000 had been received.

A short time later, the chain on one of Leonard's wrists was removed. At Jackson's dictation, he wrote a letter to his father, demanding the payment of ransom and directing him to communicate with the kidnapers through the personal column of a local newspaper. The chains then were refastened and ear plugs placed in his ears and adhesive tape over his mouth. He was taken to the bedroom with the warning not to "attempt anything"; that there were five members of the gang, some of whom were watching the house constantly.

When Leonard did not return to his office, his father became alarmed and called the police. On Saturday evening,

the first ransom letter was received by Leonard's mother and shown to police officers. A communication to the kidnapers was prepared and telephone officials alerted.

In the evening, Leonard was given food and then was made to lie chained on a mattress in the living room throughout the night. On Sunday morning he was compelled to write a second letter, repeating the demand for ransom and describing the manner in which the money was to be accumulated. During the day he remained chained and blindfolded. That evening, he was shown an advertisement in a newspaper stating that his family could not raise the sum demanded but wished to negotiate. After some discussion, Jackson and Lear agreed to reduce their demands to $300,000. Lear dictated several letters to Leonard, specifying the method to be followed by his family in delivering the money. These letters were not mailed and subsequently were destroyed.

On Monday morning, a second message appeared in the newspaper, notifying the kidnapers of acquiescence in their demands. Extensive discussions were had at that time between Lear, Jackson and Leonard as to the method of delivering the money. Leonard persuaded them that the previous plan was "too complicated," suggesting instead that they contact his brother. After some argument, Jackson and Lear agreed. They drove that night to a public telephone where Leonard was allowed to talk to Alfred. Arrangements were made to communicate with the family later.

When they returned to the house, there was more discussion regarding the method to be followed for delivery of the ransom. They settled upon a plan by which the money was to be placed in two suitcases and delivered to a specified telephone booth. Leonard was returned unchained and unbound to the bedroom while Lear left to make a telephone call. He was apprehended while attempting to do so. Upon interrogation by police officers, he admitted the kidnaping and directed them to Jackson and Leonard. When the officers broke into the house, they found Jackson in the living room, clad only in his shorts, and Leonard hiding in a closet in the bedroom.

Jackson's defense was that the asserted kidnaping was a hoax devised to extort money from Leonard's father. According to the evidence presented by him, he had known Leonard for several years. He had met with Leonard a few months before the purported kidnaping to work out a plan for accomplishing it. He denied that Leonard had been chained other than on the first day at the house.

Lear's position was that he had no knowledge of the kidnaping until Jackson appeared at the house with Leonard. He testified, however, that he assisted Jackson thereafter out of fear for himself and his stepson. His account of the events was similar in most parts to those related by witnesses for the prosecution. He concluded that the kidnaping was "phoney" when he observed Leonard unchained and there was jesting between Leonard and Jackson when the ransom notes were written. As he related the discussions with regard to delivery of the ransom money, it was agreed that Leonard was to receive either $100,000 or $200,000.

Numerous points are made by Jackson and Lear as grounds for reversing the judgment of conviction. The most important of them relate to the sufficiency of the evidence to show "bodily harm" and acts of asserted prejudicial misconduct by the trial judge and the prosecuting attorney. Other assignments of error include challenges of the rulings upon the admission of evidence and instructions to the jury.

Section 209 of the Penal Code, which prescribes the punishment for the crime of kidnaping [for ransom, reward, extortion or robbery], was amended in 1933 to provide that one convicted of that crime "shall suffer death or shall be punished by imprisonment in the state prison for life without possibility of parole, at the discretion of the jury trying the same, in cases in which the person or persons subjected to such kidnaping suffers or suffer bodily harm or shall be punished by imprisonment in the state prison for life with possibility of parole in cases where such person or persons do not suffer bodily harm." The 1933 amendment (stats. 1933, p. 2617) was patterned after the federal Lindbergh Law, which authorizes the imposition of the death penalty for kidnaping except when the victim has been liberated "unharmed."

The uncertainties of the federal statute were the subject of comment in *Robinson* v. *United States*, 324 U.S. 282 [65 S.Ct. 666, 89 L.Ed. 944], involving a prosecution under that act. There the evidence showed that the victim had suffered injuries from two violent blows on the head with an iron bar and abrasions to the lips from repeated applications of tape. Reading the word "unharmed" as meaning "uninjured," the Supreme Court stated: "Two possible reasons suggest themselves . . . as to the motivation of Congress in making the severity of a kidnapper's punishment depend upon whether his victim has been injured. The first reason

is the old belief that the severity of the injury should measure the rigor of the punishment. If this be the reasoning implicit in the statute, it would appear that Congress intended that for a kidnapper to obtain the benefit of the proviso he must both liberate and refrain from injuring his victim. Congress may equally have intended this provision as a deterrent, on the theory that kidnappers would be less likely to inflict violence upon their victims if they knew that such abstention would save them from the death penalty. This assumption finds some slight support in the legislative history, is not contested by the government, [and] has been accepted in one case [*United States* v. *Parker,* 19 F.Supp. 450, 103 F.2d 857]. . . . The quality of the injury to which Congress referred is not defined. It may be possible that some types of injury would be of such trifling nature as to be excluded from the category of injuries which Congress had in mind. We need indulge in no speculation in regard to such a category. The injuries inflicted upon this victim were of such degree that they can not be read out of the Act's scope without contracting it to the point where almost all injuries would be excluded." (Pp. 283-285.)

Similar uncertainty exists as to the precise meaning of the words "bodily harm" in section 209 of the Penal Code, to which the Legislature has given no definition. One construction of the statute was based upon the assumption of a legislative intent to adopt the traditional meaning given those words in the context of an action in tort for a battery. (*People* v. *Tanner,* 3 Cal.2d 279 [44 P.2d 324].) Said the court, "*Bodily harm* is generally defined as 'any touching of the person of another against his will with physical force in an intentional, hostile and aggravated manner, or projecting of such force against his person.' " (P. 297.) This definition was restated in subsequent opinions, but in both the Tanner case and those which followed it, the victim of the kidnaping suffered serious bodily harm. (*People* v. *Tanner, supra,* [victims bound with wire, tortured and nearly suffocated]; *People* v. *Britton,* 6 Cal.2d 1, 3 [56 P.2d 494] [victims bound with wire and one of them struck on the head]; *People* v. *Brown,* 29 Cal.2d 555, 559 [176 P.2d 929] [victim forcibly raped and struck by defendant]; *People* v. *Chessman,* 38 Cal.2d 166, 185 [238 P.2d 1001] [forcible rape and a violation of section 288a of the Penal Code].)

The only evidence of injury to Leonard is that his wrists were bound tightly by the chains so as to "cut in" and

impair to some extent the circulation of blood. There was no breaking of the skin, but "a few little marks" similar to those which would be made by the band of a wristwatch. His captors loosened the chains when he complained of their being tight. He was allowed to exercise, was given food, cigars and a newspaper to read. He was permitted to go to the bathroom, to shave, bathe and brush his teeth. When released, he stated that he felt "wonderful." No physical examination was given him at that time and there appeared to be no necessity for one.

Tested in its application to the facts of the present case, it is seriously questionable whether the definition in the Tanner case states the intention of the Legislature in distinguishing between kidnaping with bodily harm and cases in which no injury to the victim has resulted. If the more serious penalty may be imposed when the only injury is of a nature similar to that shown by the present record, which concededly is almost necessarily an incident to every forcible kidnaping, neither the purpose of enhancement of the penalty for the more heinous crime nor the intention of deterring the kidnaper from killing or injuring his victim is subserved. On the contrary, if there necessarily be bodily injury in almost every kidnaping sufficient to warrant imposition of the more serious penalty, the kidnaper might well reason that the better course for him would be to kill the victim to minimize the probability of identification.

The attorney general concedes that it is "almost impossible to conceive" of a forcible kidnaping involving more trivial injuries to the victim. Certainly, the evidence viewed most favorably in support of the judgments shows such trivial injury as to compel, as a matter of law, the conclusion that it is not of the nature contemplated by the Legislature in providing the more serious penalty for a kidnaping. In these circumstances, the determinations of the jurors, insofar as they rest upon a finding of bodily harm, cannot be upheld.

The appellants strenuously insist that because of the misconduct of the trial judge and the deputy district attorney the judgments should be reversed in their entirety. In support of this position they present more than 20 acts of asserted misconduct of the trial judge and other assertedly unfair remarks by the prosecuting attorney.

During the *voir dire* examination of prospective jurors, the judge repeatedly stated that "this is a death case,"

that they would be "duty bound" to consider the penalty, and that they should determine whether the defendants should suffer the death penalty or be imprisoned for life. Continually, when counsel for the defendants would inquire of a juror whether he would find for a defendant if he believed certain facts to be true, the judge would interrupt to ask if he would find for the prosecution if the evidence showed an opposite state of facts. There are singularly few instances in which, when the prosecuting attorney posed a state of facts, the judge inquired of the juror if he would find for the defendant if such facts were not found to be true. At one point, when counsel for Lear asked a juror if he believed an innocent man might be brought to trial, the judge interrupted to rule that the question was improper. It should not be suggested, said the judge, that the district attorney would knowingly prosecute an innocent man.

Other statements made by the judge during the course of the trial certainly carried to the jury his belief that bodily harm had been suffered by the victim. At the outset of the trial, in addressing the jurors, he told them that they were "to determine, in the last analysis, whether or not the defendants, and each of them, should suffer the death penalty or be imprisoned for life." At another time, the judge referred to the prosecution as a "capital case" and stated that the jurors would be "duty bound to determine one question of law; that is the question of penalty."

When the defense called as a witness a stenographer present at a conversation to which testimony was given adverse to Lear, she stated that she was unable to relate the conversation without referring to her notes. A request that she be allowed to refresh her recollection for the purpose of impeaching others testifying to the conversation and to present the whole of it was denied. The judge ruled: "*We* will give the counsel an opportunity to have the statement and to impeach Inspector Ahern if he wishes to, or if he thinks he can, but *we* are going to resist any attempt to get a copy of that statement of Joe Lear before Mr. Lear has taken the stand." (Emphasis added.)

During cross-examination of the complaining witness counsel for Lear stated that he was "at a loss to understand" something the witness had said. The judge remarked: "You say you are at loss to understand, but if his testimony is clear, as far as the jury is concerned, Mr. Winters, then it is of no concern what your misunderstanding may be. You are not

the trier of the facts here. If the witness has answered the question, that is all he had to do, and he doesn't have to repeat it to satisfy your apparent, as you say, lack of understanding of the answer."

At another point, the judge stated: "You know, Mr. Winters, it is the usual courtroom procedure to permit a witness to explain his answer, and you are not going to stand there and prevent this witness from explaining his answers." When counsel sought to impeach this witness by reference to the transcript of the hearing before the grand jury, the district attorney accused him of trickery. The court declined to allow the reading of a single statement from the transcript and commenced a reading of several pages of it. Objection was made that such reading by the judge would serve to emphasize the statements of the witnesses. In a long colloquy in overruling the objection the judge stated "I feel, in ruling on this matter, that there may be something to the position taken by Mr. Elkington, that there may be a trick in your question." When an objection was made, he denied saying that it was a trick; his statement, he said, was: "There may be something in what Mr. Elkington has said about a tricky question." The same judge was guilty of similar misconduct in *People* v. *Burns*, 109 Cal.App.2d 524, 544 [241 P.2d 308, 242 P.2d 9], the conviction being reversed upon that ground.

During the trial, when the prosecuting attorney referred to a subpoena for Lear and counsel challenged him to produce a copy of it, the judge interrupted to say: "He doesn't have to, any more than he has to disclose any segment of his case on behalf of the People. You know that; that is what you have been fishing for, though, for a long while. . . ."

On another occasion, just after the noon recess had been called, the judge accused all of the defense counsel of "laughing and grinning" and "jesting and joking," saying: "Let the record show that I don't observe anything funny about this." They denied that there had been any such conduct, and explained that one of them had extended an invitation to another for lunch. The record does not show what was said among defense counsel, but neither does it substantiate the judge's accusation nor indicate any actions which would justify the judge's remarks before the jury.

In charging the jury, the judge gave 59 of the 63 instructions offered by the district attorney. Counsel for Lear requested 44 instructions; two of them were allowed. Only one of the 37 charges presented by Jackson was given. In

the instructions, the judge used the word "guilty" 46 times, the words "reasonable doubt" five times, and "presumption of innocence" only once. The latter two phrases were included in two instructions. Of the three instructions given at the request of the defendants, one was the definition of reasonable doubt required by section 1096 of the Penal Code.

In presenting to the jury the other instructions requested by the defendants, the judge so remarked as to their source as to create the impression they were not charges by the court. While reading one of them, the judge remarked: "Mrs. Carr and Mr. Winters, I am going to change this instruction #6 in certain particulars" and stated the changes to be made. After giving the instruction requested by counsel for Jackson, the judge stated to him "I take it that this instruction is addressed to the testimony that you have received in relation to the act of Leonard Moskovitz in allegedly accompanying. . . ." But when, in closing argument, counsel for Lear referred to "the District Attorney's interpretation of bodily harm," the prosecution interrupted to say that such a definition would come from the court. The trial judge then said: "That is correct. I will give . . . the Jury an instruction on what constitutes bodily harm, and support it with legal authority."

Certain acts of the district attorney are also challenged as being prejudicial misconduct. Although what he said and did is not subject to as much criticism as the conduct of the judge, some of his statements merit discussion.

During the course of argument to the jury, repeated references were made to the Greenlease, Hart, and Lindbergh cases. Objections to these references were overruled and requests to admonish the jury to disregard them denied. These remarks included statements such as these: "[His kidnapers] weren't going to take any chances . . . so they killed Bobby Greenlease and buried him, and then another little act of pseudo kindness, a flower on his grave. That is the same kind of little generosity that was extended to Leonard Moskovitz . . . [when he was allowed] to smoke a couple of cigars"; and if the plan for delivering the ransom had failed "Leonard would have been buried somewhere, just as little Bobby Greenlease was buried . . . I think there is a very close comparison between the Greenlease case and the Moskovitz case, and the only difference in that, unfortunately, Bobby Greenlease wasn't rescued."

The record shows no basis whatever for the excuse that the comments now challenged were invited by any argument

of defense counsel. Reference to other cases was made in the opening argument of the district attorney. In reply counsel for Lear stated that they were dissimilar, but there was no extensive discussion of them.

Other misconduct consists of references during the trial to matters, outside the record, including examination regarding other asserted criminal acts by the defendants which could have been made only for the purpose of disparaging their character. Also, the motives of Lear and his counsel were attacked by charging that they were "hiding behind" and "using" Lear's stepson by "deliberately" subjecting him to the courtroom crowds.

If this were not a case in which the overwhelming weight of the credible evidence tends to establish the guilt of the defendants of one of the crimes of which they are charged, the misconduct of the judge and prosecuting attorney, together with other errors, would compel the judgments of conviction to be reversed in their entirety.

Under the mandate of article VI, section 4½ of the Constitution this court must dispose of the cause in such manner as to avoid a miscarriage of justice. It is conceded that the great weight of the evidence shows a kidnaping for the purpose of ransom. However, except for the manner in which the trial was conducted, the jury might have found in favor of the defendants on other issues presented by indictment.

The judgments upon all counts of the indictment are reversed with directions to the trial court to impose upon each defendant a sentence of life imprisonment for the crime of kidnaping for the purpose of ransom as charged in count I of the indictment; the orders denying the defendants' motions for a new trial are affirmed.

Gibson, C. J., Shenk, J., and Spence, J., concurred.

CARTER, J.—I dissent.

In his first inaugural address (March 4, 1801) Thomas Jefferson declared: "Equal and exact justice to all men . . . freedom of religion, freedom of the press, freedom of person under the protection of the habeas corpus; and trial by juries impartially selected,—these principles form the bright constellation which has gone before us." This declaration was predicated on the Bill of Rights adopted ten years previous which is the foundation of the American tradition that every person charged with the commission of a public offense shall

be accorded a fair and impartial trial. In my opinion the preservation of that tradition is of greater importance in the perpetuation of the American way of life than any other principle postulated by that immortal document.

There can be no doubt that this tradition has been desecrated by the conduct of the trial judge and the prosecutor in this case. Such conduct, as disclosed by the record and set forth in the majority opinion, could have no other effect than to deprive the defendants of every semblance of a fair and impartial trial. Conceding that evidence of the guilt of the defendants may be overwhelming, I can see no other conclusion than that they were denied a fair and impartial trial and that article VI, section 4½, of the Constitution of California cannot be construed to uphold a verdict and judgment rendered in such an atmosphere of prejudice and unfairness.

I would therefore reverse the judgments and grant each of the defendants a new trial.

TRAYNOR, J.—I dissent.

The record of the misconduct of the trial judge and prosecuting attorney as set forth in the majority opinion demonstrates that defendants were denied a fair and impartial trial. Because of the abundant evidence that defendants were guilty of kidnaping, it is contended that they could not have been prejudiced in the determination of this issue. ''Regardless of their guilt, however, they were entitled to a fair and impartial trial. (*Moore* v. *Dempsey,* 261 U.S. 86, 87-88, 92 [43 S.Ct. 265, 67 L.Ed. 543]; see concurring opinion of Mr. Justice Jackson in *Shepherd* v. *Florida,* 341 U.S. 50 [71 S.Ct. 549, 95 L.Ed. 740].) 'Neither can a plea for the application of [Art. VI, § 4½] of the constitution save this situation. The fact that a record shows a defendant to be guilty of a crime does not necessarily determine that there has been no miscarriage of justice. In this case the defendant did not have the fair trial guaranteed to him by law and the constitution.' (*People* v. *Mahoney,* 201 Cal. 618, 627 [258 P. 607].)'' (*People* v. *McKay,* 37 Cal.2d 792, 798 [236 P.2d 145].)

Schauer, J., concurred.

The petitions of appellants and respondent for a rehearing were denied May 25, 1955. Carter, J., Traynor, J., and Schauer, J., were of the opinion that the petitions should be granted.