[Crim. No. 18000. First Dist., Div. One. Nov. 4, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES LEONARD SCHOENFELD et al.,
Defendants and Appellants.

COUNSEL

Merrill, Thiessen & Gagen, Edward L. Merrill, Mark L. Armstrong, · Herbert W. Yanowitz and John R. Fisher for Defendants and Appellants.

George·Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Derald E..Granberg, John T. Murphy and Stan M. Helfman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**RACANELLI, P. J.**—Just over four years ago the peace and quiet of the small rural community of Chowchilla was shattered by the disappearance of a busload of local school children. News of the disappearance stunned the people of the entire state, and bewilderment soon gave way to consternation when the empty school bus was discovered in a dry creek bed without a trace of its passengers. The hours of suspense dragged on amid feelings of growing apprehension. The silent agony of the victims' families and friends ended, mercifully, the following evening when, as a result of the heroic efforts of the bus driver, the youngsters emerged safely from their underground imprisonment. Following defendants' arrest, indictment and after extensive pretrial proceedings, each defendant pled guilty to 27 separate counts of kidnaping for ransom (Pen. Code, § 209) and received concurrent sentences of life imprisonment on each count. In three of the counts, the victims were found to have suffered "bodily harm" resulting in a determination of parole ineligibility. Defendants' principal claim of reversible error focuses on the validity of those findings. Since we determine that the challenged findings are invalid as a matter of law, we need not reach the merits of defendants' remaining challenge based upon constitutional grounds and related request for further hearings. Instead, we

properly strike the invalid findings but affirm the sentences of life imprisonment imposed on each defendant rendering unnecessary the suggested remand for further proceedings and the likely revival of painful but now faded childhood memories.[1]

## Procedural Background

On August 25, 1976, the Grand Jury of Madera County returned an indictment against defendants James Leonard Schoenfeld, Richard Allen Schoenfeld and Frederick Newhall Woods, charging each of them with 27 counts of violation of Penal Code section 209 (kidnap for ransom) and 18 counts of violation of Penal Code section 211 (robbery). Five of the kidnaping for ransom counts further alleged that the victims therein "suffered bodily harm," to wit: Count one (victim Frank Edward Ray, Jr.); count three (victim Jennifer Brown); count five (victim Jodi Heffington); count seven (victim Rebecca Reynolds); count eight (victim Cindy Van Hoff).

On September 14, 1976, the indictment was amended to clarify the charging allegations of robbery consistent with the substantive language of the statute. A series of pretrial motions (including a successful motion changing trial venue to the County of Alameda), and attendant review petitions, thereafter followed.[2]

On July 25, 1977, pursuant to earlier plea discussions between the prosecution and defense, defendants were permitted to withdraw their not guilty pleas and to enter guilty pleas to all of the 27 kidnaping counts while reserving the right to contest the disputed allegations of bodily harm in a bifurcated proceeding before the court without a jury.

---

[1]At the time of the offenses, Penal Code section 669 required that the sentence imposed on multiple convictions merge and run concurrently with any prescribed punishment of life imprisonment "whether with or without possibility of parole,...." (Cf. *In re Ward* (1966) 64 Cal.2d 672, 678 [51 Cal.Rptr. 272, 414 P.2d 400], cert. den. 385 U.S. 923 [17 L.Ed.2d 147, 87 S.Ct. 238].)

[2]Those proceedings and orders included: 1) sealing of records from the public, October 19, 1976; 2) pretrial discovery order, October 22, 1976; 3) change of venue order, November 5, 1976; 4) change of counsel order, December 6, 1976; 5) motion of second change of venue, February 4, 1977; 6) dismissal motion pursuant to Penal Code section 995, February 23, 1977; 7) motion for postindictment preliminary hearing, February 23, 1977; 8) suppression motion pursuant to Penal Code section 1538.5, denied April 26, 1977; 9) writ of mandate requesting change of venue, denied June 8, 1977, 1 Civ. 41387; and 10) writ of mandate requesting closed suppression motion, denied June 8, 1977, 1 Civ. 41501, California Supreme Court hearing denied July 6, 1977, 1 Civ. 41386.

Upon conclusion of a number of preliminary matters, evidence was presented by both sides on the issue of bodily harm. On December 15, 1977, the court announced its decision that the kidnap victims named in counts three, five and seven had suffered "bodily harm" but that the victims named in counts one and eight had not. On February 17, 1978, following post conviction sentencing proceedings which included challenges directed to the constitutionality of the augmented penalty for aggravated kidnaping, the court pronounced judgment sentencing each defendant to a term of life imprisonment on each of the 27 counts of kidnaping but without possibility of parole as to counts three, five and seven, the sentences to be served concurrently. The Youthful Offender Act[3] was expressly invoked as to defendant Richard Schoenfeld only. All defendants filed a timely motion of appeal from the final judgment of conviction and sentences imposed.

## STATEMENT OF FACTS

The record discloses the following relevant and essentially undisputed facts: The events underlying the unprecedented mass kidnaping began at approximately 4 p.m. on July 15, 1976, on the outskirts of the small California community of Chowchilla when the defendants acting in concert ambushed a Dairyland Union School bus, abducted its youthful occupants and driver and ultimately transported them to a Livermore quarry site where they were imprisoned for some 16 hours in a previously buried furniture van. The nightmarish episode ended about 8 p.m. on July 16 when the kidnaped youngsters successfully escaped from the underground van as the result of the courageous efforts of the bus driver, Frank Edward Ray, Jr., aided by two of the older children. The bizarre ransom kidnaping plot,[4] hatched several months earlier, was executed as the school bus returning the children to their homes from a summer school session was forced to a stop by a white van parked across the roadway. At that point one of the defendants, wearing a nylon stocking mask, jumped into view and, at gun point, ordered Mr. Ray to open the bus door. Immediately, the armed man and his masked companion entered the bus and commandeered it and its pas-

---

[3]Under the then existing provisions of the act (former Pen. Code, §1202b, repealed by Stats. 1976, ch. 1139, §274, eff. July 1, 1977), defendant Richard Schoenfeld, who was under the age of 23 years at the time of commission of the offenses, received a minimum sentence of 6 months on each count concurrently. Neither the application of the statute nor defendant's eligibility thereunder is an issue in this appeal.

[4]As near as we can determine from the record of the sentencing proceedings, the actual conspiracy evolved from an earlier plan to produce a movie film based upon a

sengers to a dry slough area about one mile distant where a green van was parked. Upon the arrival of the white van driven by defendant Woods, the hostages were transferred into the two passenger vans. After camouflaging the abandoned bus, defendant Richard Schoenfeld drove the green van while defendant Woods drove the white van to the Livermore quarry site; defendant James Schoenfeld followed in a third or spare van. Mr. Ray and approximately 15 of the children, including the victims Jennifer, Jodi and Rebecca, were loaded into the green van, a former military police prisoner transport vehicle.[5] The rest of the children were placed in the white van.[6]

Mr. Ray and the young captives remained in the overcrowded green van without food, water or convenience stops during transit. About 3:30 the next morning they arrived at their destination near Livermore, California: the California Rock & Gravel Quarry, a business enterprise owned and operated by defendant Woods' father. After a long delay in the overcrowded van (due to the need to first activate the furniture van's ventilation system and to await the arrival of James Schoenfeld with a supply of food), Mr. Ray and the children were finally unloaded and, under cover of a connecting tent-like canopy, transferred to the previously buried furniture van through a hole cut in the roof of the van. Mr. Ray entered the van first and, with the aid of a flashlight pro-

fictional mass kidnaping. The elaborately contrived plan was apparently motivated by an overpowering drive to achieve independent financial success, a social objective frequently emphasized during the defendants' adolescent years. Two of the young men were deeply indebted as the result of unsuccessful efforts to restore and relocate an historic peninsula mansion. None of the defendants had a criminal record of any consequence. Uncontroverted evidence disclosed that the plot was wholly out of character and represented a delusional lifelong pattern of judgmental unreality. The details of the kidnap plan reveal that: 1) the Dairyland school area was arbitrarily selected because it would be far enough away from the quarry site during the anticipated intensive search of the surrounding "100 mile area"; 2) the $5 million ransom was to be paid by the state; 3) the furniture van was buried instead of simply guarded above ground mainly because the ransom recovery plan required all three participants. In the event the ransom was not paid as demanded, or any of the children required medical attention, the plot was to abort and the victims immediately released.

[5]The enclosed passenger or load compartment, measuring eight and three-quarter feet in length, five and one-half feet in width and three and three-quarter feet in height, was ventilated by an independent air system consisting of two air ventilators and two exhaust fans powered by motors encased in a duct housing on the roof. The enclosed compartment thus contained a total of nearly 200 cubic feet of air space, or an average air space of 11-1/2 to 13 cubic feet per person. The ventilation system had an operating capacity of 358 cubic feet of air per minute.

[6]The parties make no specific reference to the record concerning the description of the white van, presumably because none of the named victims were passengers. Apparently, the three vehicles were similar model Dodge passenger vans.

vided by defendants, assisted the children as they descended by ladder into the van. Before their descent, defendants obtained the name and age of each child together with a personal item from most, ostensibly for purposes of later verification of the kidnaping.[7]

In addition to a number of mattresses, several blankets and 10 five-gallon containers of water, the underground van contained a small supply of dry foodstuffs and potato chips.[8] After informing the children they would remain in the van for 24 to 48 hours, the defendants sealed the roof opening by placing a steel plate over the hole which was in turn weighted down by 2 heavy batteries; a rectangular piece of plywood was then placed over the assembly and covered with a 2-foot layer of dirt. The Fruehauf model furniture van had been acquired in relatively good condition by defendant Woods during the previous November. It measured 26 feet long, 6-3/4 feet wide and 8 feet in height, thus providing approximately 1,470 cubic feet of air space or 54 cubic feet of air space per occupant and approximately 6-1/2 square feet of floor space per person. Three holes had been cut in the van walls; lengths of flexible ribbed hose, four inches in diameter, ran from two of these holes to connecting intake and exhaust fans powered by several twelve-volt electric batteries.[9] Crude holes had been cut in the fender wells of the van to serve as primitive toilets. Estimates of air temperature within the transport and underground vans varied; a number of the witnesses testified the temperatures were very warm; many of them indicated that the operating ventilating systems actually produced cool temperatures. Mr. Ray testified that the temperature in the green van was the same as the ambient air temperature. Expert testimony indicated the temperatures on the day in question ranged from a low of 62 degrees Fahrenheit to a high of 98 degrees in Madera and a similar range of 54 to 87 degrees in Livermore. As a result of the close conditions of confinement, aggravated by the forced incontinence of the frightened and confused children, the befouled and humid air in both vans caused some labored breathing on the part of many of the youngsters.

---

[7]Apparently, it was the taking of these several items of personal property that served as the basis for the robbery charges which were ultimately dismissed upon the prosecutor's motion.

[8]A later inspection disclosed that almost all of the food was consumed by the children; however, over 27 gallons of drinking water remained.

[9]The battery-powered ventilation system was capable of producing 59 cubic feet of air per minute or a total air volume change every 25 minutes. The intake and exhaust fans continued to operate until about 8:15 a.m. of July 18th, a period in excess of the 48 hours determined in trial tests previously conducted by defendants.

After hours of desperate concern whether their captors would return to release them safely, Mr. Ray contrived a plan of escape: together with the aid of two of the teenaged youngsters, mattresses were stacked together forming a platform to the roof of the van; after considerable exertion, Mr. Ray and one of the boys succeeded in removing the plywood and steel lids covering the entrance hole. All of the victims, the youngest again assisted by the indomitable driver, then scrambled through the opening to safety. Aside from minor cuts and bruises and the insubstantial transient injuries described below, none of the victims sustained a significant physical or corporeal injury.

### FINDINGS OF BODILY HARM

It was the prosecution theory that bodily harm was sustained by the named victims as a result of certain minor injuries and heat exhaustion due to the oppressive conditions which existed in the transport and underground vans. The slight injuries sustained by Mr. Ray during the escape effort (minor finger cuts) and Cynthia Van Hoff during the ladder descent (scraped knee) were found to be insubstantial and trivial. Additionally, a toe abrasion sustained by Rebecca in the course of exiting the underground van was diagnosed as a superficial skin injury. Medical examination of the victims shortly after their escape disclosed no gross evidence of somatic injuries of a significant nature. Expert testimony in support of the heat exhaustion theory of injury was rejected by the trier of fact as conjectural and lacking in any probative force.

Jodi Heffington, age 10, who was susceptible to nose bleeds, testified that her nose bled briefly after being accidentally bumped by Jennifer in the transport van and again spontaneously while in the underground van. She also complained of nausea and stomach upset while in both vans. Jennifer, age nine, experienced a fainting spell, and stomach distress while in both vans. Rebecca, age nine, testified to a similar fainting spell and stomachache in both vans as well as a spontaneous nosebleed during her underground confinement. Defense medical evidence attributed the fainting experiences to the children's understandable anxiety and apprehension rather than heat exhaustion. In the opinion of Dr. Herman, whose testimony the trial court found "more impressive," conditions of acute anxiety as shown by the evidence could never cause either injury or harm, and the symptoms of stomach distress and nausea were frequently the result of hormonal secretions induced by an emotional state of fright or anxiety.

The trial court expressly accepted the testimony of the guileless youngsters, and found that 1) Jennifer had fainted and experienced stomachaches in both vans; 2) Jodi had sustained a nosebleed and stomachache while in both vans; and 3) that Rebecca had also fainted and experienced a stomachache in both vans and a nosebleed in the underground van. In summarizing the conditions of confinement which contributed to the victims' hostile environment (overcrowding, "temperature problems," the foul odor of bodily excretions, "breathing difficulties" and fear of a cave-in) the trial court reasoned that the total experience constituted "an ordeal of terror,...[which]...causes suffering.... And suffering to me is what this statute is all about." The court finally concluded the nosebleeds, fainting and stomachaches substantiated "the tremendous amount of suffering that was sustained." Based upon that state of evidence the trial court found that the victims in counts three, five and seven (Jodi, Jennifer and Rebecca) had suffered bodily harm but that the victims in counts one and eight (Mr. Ray and Cynthia) had not.

## CONTENTS

Defendants challenge the sentence of life imprisonment without possibility of parole on grounds 1) that the evidence was insufficient and 2) that the mandatory penalty of perpetual imprisonment contravenes both federal and state constitutional provisions proscribing cruel and unusual, and cruel or unusual, punishment generally and as applied herein. Defendants raise additional claims of reversible error relating to denial of a *Ballard* motion (*Ballard* v. *Superior Court* (1966) 64 Cal.2d 159 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416]), refusal of a postindictment preliminary hearing and the admission of evidence of emotional harm and anxiety. For reasons which we hereafter explain, our resolution of two of these contentions is dispositive of the appeal.

 Defendants' central claim is that the findings of bodily harm which automatically invoke the aggravated penalty are unsupported by substantial evidence. While recognizing that the test on appeal requires that due deference be accorded to the fact finder's evaluation of the evidence and credibility of the witnesses (*People* v. *Thornton* (1974) 11 Cal.3d 738, 754 [114 Cal.Rptr. 467, 523 P.2d 267], cert. den. 420 U.S. 924 [43 L.Ed.2d 393, 95 S.Ct. 1118], overruled on other grounds in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1]), it is strenuously argued that the evidence underlying the factual determinations that three of the kidnaped youngsters had suf-

fered bodily harm is insufficient as a matter of law. Subsumed in defendants' contention is the insistent claim that the *physical* injuries or harm suffered were simply unsubstantial, transitory forms of bodily distress insufficient to rise to the level of bodily harm contemplated by the Legislature in order to automatically trigger the extreme penalty of perpetual imprisonment. While defendants candidly concede that the record is replete with evidence of *mental* harm in the form of fear and anxiety, it is vigorously contended that the evidence of temporary bodily discomfort sustained by the three youngsters during their confinement does not amount to *substantial bodily injury* within the meaning of the enhancement proviso as interpreted by the courts.

The People with equal ardor counter that findings of bodily harm based upon the infliction of "unnecessary suffering and terror" are indisputably valid.

I

Although the competing claims are framed in terms of conventional standards of judicial review relating to the sufficiency of the evidence supporting the critical findings (see *Jackson* v. *Virginia* (1979) 443 U.S. 307 [61 L.Ed.2d 560, 99 S.Ct. 2781], rehg. den. 444 U.S. 890 [62 L.Ed.2d 126, 100 S.Ct. 195]; *People* v. *Johnson* (1980) 26 Cal.3d 557, 575-577 [162 Cal.Rptr. 431, 606 P.2d 738]; see also *People* v. *Perry* (1972) 7 Cal.3d 756, 785 [103 Cal.Rptr. 161, 499 P.2d 129]), where the underlying facts are undisputed—as here shown—the question whether such probative facts support the conclusions drawn becomes one of law reviewable on appeal. (*Gonzales* v. *Municipal Court* (1977) 67 Cal.App.3d 111, 120 [136 Cal.Rptr. 475]; *Smith* v. *Department of Motor Vehicles* (1969) 1 Cal.App.3d 499, 503 [81 Cal.Rptr. 800].) Additionally, while the language in some recent decisions tends to blur any practical distinction in deciding claims of insufficiency using a combined substantial evidence question of law analysis,[10] those which have considered the enhancement provision have consistently viewed the issue whether the nature of the undisputed injury constitutes bodily harm

---

[10]See for example *People* v. *Green* (1980) 27 Cal.3d 1, 59-62 [164 Cal.Rptr. 1, 609 P.2d 468] [evidence of felony murder insufficient as a *matter of law* to support finding of robbery special circumstance]; *People* v. *Caudillo* (1978) 21 Cal.3d 562, 587-589 [146 Cal.Rptr. 859, 580 P.2d 274] [insubstantial, transitory injuries not within the statutory meaning of "great bodily injury"]; but compare *People* v. *Thompson* (1980) 27 Cal.3d 303, 321-325 [165 Cal.Rptr. 289, 611 P.2d 883] [finding of special circumstance unsupported by *substantial* evidence].

within the meaning of section 209 as purely a matter of law. (See e.g. *People* v. *Timmons* (1971) 4 Cal.3d 411, 414 [93 Cal.Rptr. 736, 482 P.2d 648]; *People* v. *Daniels* (1969) 71 Cal.2d 1119, 1140 [80 Cal. Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677]; *People* v. *Jackson* (1955) 44 Cal.2d 511, 517 [282 P.2d 898].)

■ In undertaking our analysis, we must construe relevant statutory language "according to our best understanding of the legislative intent" (*People* v. *Daniels, supra*, 71 Cal.2d 1119, 1128) and in a manner consistent with sound principles of construction in attempting to effectuate such legislative intent in accordance with the "ordinary import of the language employed...." (*People* ex rel. *Younger* v. *Superior Court* (1976) 16 Cal.3d 30, 40 [127 Cal.Rptr. 122, 544 P.2d 1322].) ■ Moreover, in construing a criminal statute, any reasonable doubt as to its intended meaning must be resolved in favor of a defendant. (*People* v. *Caudillo, supra*, 21 Cal.3d 562, 576; *In re Zerbe* (1964) 60 Cal.2d 666, 668 [36 Cal.Rptr. 286, 388 P.2d 182, 10 A.L.R.3d 840].)

Prior to recent amendments, section 209 provided that anyone convicted of the crime of kidnaping for either ransom or robbery "shall suffer death in cases in which any person subjected to any such act suffers death, or shall be punished by imprisonment in the state prison for life without possibility of parole in cases in which any person subjected to any such act suffers bodily harm, or shall be punished by imprisonment in the state prison for life with the possibility of parole in cases where no such person suffers death or bodily harm."[11]

The penalty enhancement added by amendment nearly 50 years ago was patterned after the so-called federal Lindbergh Law sanctioning the death penalty for any kidnaping except when the victim had been liberated unharmed. (See *People* v. *Jackson, supra*, 44 Cal.2d 511, 515; see also Enright, *California's Aggravated Kidnaping Statute—A Need for Revision* (1967) 4 San Diego L.Rev. 285.) Enacted in response to the public outcry following an "epidemic of nationally publicized kidnapings" (*In re Maston* (1973) 33 Cal.App.3d 559, 562 [109 Cal.Rptr. 164]; Comment (1936) 24 Cal.L.Rev. 220), the 1933 amendment ini-

[11]This section was amended as a part of the 1976 determinate sentencing law by enacting subdivision (b) limiting punishment for robbery kidnapings to life imprisonment with possibility of parole. (Added by Stats. 1976, ch. 1139, § 136.5, p. 5099.) A later amendment deleted the death penalty while retaining the penalty of life without possibility for parole where the person subjected to any act of ransom kidnaping "suffers death or bodily harm." (Stats. 1977, ch. 316, § 15, p. 1262, eff. Aug. 11, 1977; see also Pen. Code, § 190.2.)

tially was broadly construed by the courts in upholding convictions without evidence of asportation (*People* v. *Knowles* (1950) 35 Cal.2d 175 [217 P.2d 1]); where the kidnaper formed the intent to extort or rob *during* the kidnaping (*People* v. *Brown* (1947) 29 Cal.2d 555, 558 [176 P.2d 929]; and where the brief "room to room" movement of the victims was merely incidental to the robberies without substantially increasing the risk of harm. (*People* v. *Wein* (1958) 50 Cal.2d 383 [326 P.2d 457]; *People* v. *Knowles, supra,* 35 Cal.2d 175; *People* v. *Chessman* (1951) 38 Cal.2d 166 [238 P.2d 1001]; *People* v. *Tanner* (1935) 3 Cal.2d 279 [44 P.2d 324].) As this court noted on an earlier occasion, the draconian results produced by overzealous prosecutions and rigid interpretations remained virtually unchecked until the 1951 amendment requiring criminal asportation and the landmark Supreme Court decision in *People* v. *Daniels* (*infra*) [71 Cal.2d 1119] interpreting the amended statute to exclude incidental movements involving no substantial increase in the risk of harm to the victim from the reach of the enhanced penalty for robbery kidnapings. (See *In re Dennis* (1975) 46 Cal.App.3d 50, 57, 60-61 [120 Cal.Rptr. 267].) Yet, as both the trial court and counsel readily acknowledge, the Legislature has *never* provided a definition for the statutory standard mandating permanent life imprisonment.[12] Thus, any meaningful interpretation within the factual context herein must be derived through a careful scrutiny of the relevant decisions.

In the first reported case to consider the validity of the death penalty imposed upon convictions of aggravated kidnapings, the court relied upon a *tort* definition of battery in defining bodily harm as "any touching of the person of another against his will with physical force in an intentional, hostile and aggravated manner, or projecting of such force against his person." (*People* v. *Tanner, supra,* 3 Cal.2d 279, 297.) In *Tanner,* involving the residential robbery-kidnaping of an attorney and his family, the court upheld findings of bodily harm where Mr. Bodkin was tortured by fire and Mrs. Bodkin, her son and a servant were first imprisoned for an extended period in a windowless, unventilated three-by five-foot closet and then left in another room bound hand and foot with ropes and wires.

The *Tanner* definition of bodily harm was routinely applied by the courts for two decades in upholding enhanced penalties in robbery-kid-

---

[12]Compare, for example, Penal Code section 12022.7, where the Legislature has provided a specific definition for "great bodily injury" [a significant or substantial physical injury] warranting a *three-year* penalty enhancement.

napings which involved seriously aggravated assaults (*People* v. *Britton* (1936) 6 Cal.2d 1, 3 [56 P.2d 494]), and other physical and sexual assaults. (*People* v. *Brown, supra,* 29 Cal.2d 555, 559-560; *People* v. *Chessman, supra,* 38 Cal.2d 166, 185.) But, in *People* v. *Jackson, supra,* 44 Cal.2d 511, the court invalidated a finding of bodily harm on defendants' conviction of kidnaping for ransom where the only evidence of injury to the victim consisted of having his wrists bound by chains causing some circulatory impairment and minor skin abrasions. The reasoning of the *Jackson* court is instructive: "One construction of the statute was based upon the assumption of a legislative intent to adopt the traditional meaning given those words in the context of an action in tort for a battery. (*People* v. *Tanner,* 3 Cal.2d 279 [citations].) Said the court, '*Bodily harm* is generally defined as "any touching of the person of another against his will with physical force in an intentional, hostile and aggravated manner, or projecting of such force against his person."'" (P. 297.) This definition was restated in subsequent opinions, but in both the *Tanner* case and those which followed it, the victim of the kidnaping suffered serious bodily harm. (*People* v. *Tanner, supra,* [victims bound with wire, tortured and nearly suffocated]; *People* v. *Britton,* 6 Cal.2d 1, 3 [citations] [victims bound with wire and one of them struck on the head]; *People* v. *Brown,* 29 Cal.2d 555, 559 [citations] [victim forcibly raped and struck by defendant]; *People* v. *Chessman,* 38 Cal. 2d 166, 185 [citations] [forcible rape and a violation of section 288a of the Penal Code].) . . . [¶] Tested in its application to the facts of the present case, it is seriously questionable whether the definition in the Tanner case states the intention of the Legislature in distinguishing between kidnaping with bodily harm and cases in which no injury to the victim has resulted. If the more serious penalty may be imposed when the only injury is of a nature similar to that shown by the present record, which concededly is almost necessarily an incident to every forcible kidnaping, neither the purpose of enhancement of the penalty for the more heinous crime nor the intention of deterring the kidnaper from killing or injuring his victim is subserved. On the contrary, if there necessarily be bodily injury in almost every kidnaping sufficient to warrant imposition of the more serious penalty, the kidnaper might well reason that the better course for him would be to kill the victim to minimize the probability of identification." (*People* v. *Jackson, supra,* 44 Cal.2d at pp. 516-517.)

Ten years later, the *Tanner* definition of bodily harm, substantially undermined by the *Jackson* court, was expressly repudiated in *People* v. *Gilbert* (1965) 63 Cal.2d 690, 711 [47 Cal.Rptr. 909, 408 P.2d 365],

vacated on other grounds (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951]. In upholding the trial court's refusal to instruct on the *Tanner* definition of bodily harm the court again pointed out that "in the *Tanner* case and the cases following it, the kidnaping victim suffered *serious bodily injury.*" (*Id.* at p. 711; italics added.) Any doubt as to the remaining vitality of the *Tanner* definition[13] was put to rest a few years later in the benchmark decision *People v. Daniels, supra*, 71 Cal.2d 1119, rejecting the rigid *Chessman-Wein* emphasis on the fact of movement rather than the distance involved (*id.* at p. 1129) in favor of the more enlightened rule of construction excluding "standstill" robberies and those involving only incidental movement without substantially increasing the risk of harm to the robbery victim from liability under the aggravated kidnaping statute. In drawing an analogy to decisions construing the equally essential component of "bodily harm" despite the intervening period of legislative silence, the court reaffirmed its holding in *Jackson* that a trivial or insubstantial injury was not within the legislative contemplation in providing for the more serious penalty since "'neither the purpose of enhancement. . . for the more heinous crime nor the intention of deterring the kidnaper from killing or injuring his victim is subserved.'" (*Id.* at p. 1133.) Moreover, as the *Daniels* opinion notes (fn. 7, p. 1133), the rule distilled from the *Jackson* holding has since been incorporated into a judicially approved standard jury instruction.[14] (See *People v. Reed* (1969) 270 Cal.App.2d 37, 48-49 [75 Cal.Rptr. 430].)

In summary, the *Tanner* definition of bodily harm has long since been repudiated and replaced by the more enlightened *Jackson* rule which requires 1) a substantial or serious injury to the body of the kidnaped victim, 2) by application of a physical force, 3) beyond that necessarily involved in the forcible kidnaping. (See *In re Dennis, supra*, 46 Cal.App.3d 50, 57; see also *People v. Caudillo, supra*, 21 Cal.3d 562, 580 at fn. 10.) Not only does such contemporary definition pro-

---

[13]Some commentators have interpreted *Jackson* to have merely questioned but not overruled the *Tanner* definition. (See 1 Witkin, Cal. Crimes, § 357, p. 328; Fricke & Alarcon, Cal. Criminal Law (10th ed.) p. 214 [Judge Fricke presided over the *Tanner* trial].)

[14]Former CALJIC No. 655 stated in relevant part: "'Bodily harm,' as that term is used in this instruction, means substantial *bodily* injury *or damage* to the body of a person who is the victim of such kidnaping by the application of physical force above and in addition to the force which is necessarily involved in the commission of such kidnaping." [Italics added.] (See now CALJIC No. 9.22 (1979 rev.) deleting the emphasized parts but otherwise retaining substantially the same language as former CALJIC No. 655.)

mote the dual legislative purposes of enhancement and deterrence (*People* v. *Jackson, supra,* 44 Cal.2d 511, 517), but it also reflects doctrinal consistency with the parallel developments in decisional law related to the crime of robbery-kidnaping requiring asportation in the form of a substantial movement which markedly increases the risk of harm to the victim beyond that necessarily involved in the underlying robbery. (*People* v. *Daniels, supra,* 71 Cal.2d 1119, 1138-1140; *In re Earley* (1975) 14 Cal.3d 122, 129-130 [120 Cal.Rptr. 881, 534 P.2d 721]: see also *People* v. *Timmons, supra,* 4 Cal.3d 411; *People* v. *Mutch* (1971) 4 Cal.3d 389 [93 Cal.Rptr. 721, 482 P.2d 633].) This modern standard defining both the nature and quantum of the harm-producing force establishes binding precedent (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937]) which has been consistently applied by intermediate courts of review. (See e.g., *People* v. *Soto* (1977) 74 Cal.App.3d 267 [141 Cal. Rptr. 343] [injuries from being handcuffed trivial and unsubstantial]; *People* v. *Isitt* (1976) 55 Cal.App.3d 23, 29 [127 Cal.Rptr. 279] [beating, kicking and shooting victim constituted substantial bodily injury]; *In re Dennis, supra,* 46 Cal.App.3d at p. 57 ["substantial harm" required]; *People* v. *Cleveland* (1972) 27 Cal.App.3d 820, 830 [104 Cal. Rptr. 161] [shooting of victim constituted "serious injuries"]; *People* v. *Dacy* (1970) 5 Cal.App.3d 216, 226 [85 Cal.Rptr. 57] [lacerated knee requiring 20 stitches constituted bodily harm].)

■ In applying the *Jackson* rule, the courts have recognized that the enhancement provision is properly invoked whenever the victim has endured or sustained substantial bodily or physical injury unnecessarily and gratuitously inflicted by the kidnaper or proximately caused as a foreseeable consequence of the kidnaper's intentional acts. (See *People* v. *Isitt, supra,* 55 Cal.App.3d 23, 29; see also *People* v. *Monk* (1961) 56 Cal.2d 288, 296 [14 Cal.Rptr. 633, 363 P.2d 865]; *People* v. *Frogge* (1969) 270 Cal.App.2d 106, 117-119 [75 Cal.Rptr. 517] [physical injuries sustained in victims' attempted escape a foreseeable result of defendants' threatened violence]; *People* v. *Dacy, supra,* 5 Cal.App.3d 216, 221; *People* v. *Reed, supra,* 270 Cal.App.2d 37, 48-50 [victims' injuries inflicted during police rescue efforts a foreseeable result of defendant's actions]; but cf. *People* v. *Baker* (1964) 231 Cal.App.2d 301 [41 Cal.Rptr. 696, 11 A.L.R.3d 1046] [injury sustained leaping from hijacked truck not the result of a gratuitous act by defendant].) However, the isolated circumstance of physical restraint or confinement of the victim has been traditionally viewed as being necessarily incident to the forcible kidnaping itself rather than a demonstration of a sepa-

rate and gratuitous act of bodily harm. (See e.g., *People* v. *Soto, supra*, 74 Cal.App.3d 267, 276-277 [victim confined in a foot locker during kidnaping].)

Without dispute, there are few crimes more serious than the crime of forcible kidnaping for the base purpose of ransom. (*In re Maston, supra*, 33 Cal.App.3d 559, 563.) And every kidnaping for purposes of ransom necessarily will involve some clandestine movement and ultimate concealment of the abducted victim. But while such egregious conduct necessarily involves some form of physical restraint, it is the introduction of substantial *bodily* harm or injury—not the physical restraint—which triggers the augmented penalty. (Id. at p. 563.) ▮ None of the transient physical distresses, consisting of stomach aches, nose bleeds and fainting, amounted to serious or substantial bodily injuries. The minor physical injuries sustained related to the conditions of confinement and were not the result of the application of physical force by the defendants beyond that involved in effecting the instant kidnaping. Aside from the probably foreseeable accidental kicking, such harm as was sustained by all of the victims in common was not the result of the intentional or gratuitous infliction of force upon the victims by their abductors, a conclusion reached by the trial judge as well.

Unquestionably, in every kidnaping the nature of the movement and confinement itself usually will produce varying degrees of fear, anxiety and personal discomfort in the victims, as here vividly demonstrated. Indeed, it is difficult to imagine a more terrifying set of circumstances than those depicted herein; the mass abduction at gunpoint of a bus load of school children, forced to endure prolonged periods of discomfort in the crowded transportation van; their dead-of-night transfer to the underground van for an even longer period under conditions and circumstances calculated to arouse anxiety and fear even among the most stoic and stouthearted. No rational person could doubt that the combined effect of such difficult and trying circumstances, together with the level of fear generated during the long hours of dark confinement, would cause *all* of the imprisoned victims—especially the youngest—to undergo great *mental* suffering or *emotional* harm implied in the findings below. But as the cases which have grappled with the amorphous concept of "bodily harm" in a variety of factual contexts teaches, something more than emotional trauma or mental or psychological harm, typically associated with all forms of involuntary restraint and confinement, is required in order to justify the harsher mandatory penalty

which under certain conditions may even produce anomalous results.[15] (See *In re Maston, supra*, 33 Cal.App.3d at pp. 564-565 and fn. 6.)

Though it is debatable that no meaningful distinction exists in human terms between trauma-inflicted pain and suffering as opposed to fright-induced mental anxiety and emotional distress, the latter is not the functional equivalent of a substantial bodily injury due to the application of a physical force beyond that necessarily involved in the forcible restraint itself. The trial court compounded its error in mechanically equating the statutory objective with any level or kind of "suffering."[16] But as discussed herein, it appears eminently more reasonable to conclude that *all* kidnapings involve some degree of suffering insofar as mental distress or emotional harm is relatively manifested. If, as the People contend, such evidence alone (with or without minor physical symptoms) is sufficient, then conceptually every forcible restraint and confinement would be automatically subject to the augmented penalty without the essential showing of substantial bodily injury. Such an unreasonable result would totally defeat the dual purpose of preventing physical harm to the victim and providing an added penalty for the more abhorrent criminal conduct. (*People* v. *Jackson, supra*, 44 Cal.2d at p. 517.) Even the discredited *Tanner* definition recognized the fundamental distinction between *bodily* or *physical* suffering as opposed to *mental*.[17] (*People* v. *Tanner, supra*, 3 Cal.2d 279.) Moreover, in applying the announced standard to the peculiar conditions of imprisonment therein (one of the circumstances relied upon in finding bodily harm), the court explicitly related the concept of bodily harm to the nonconsensual application of "physical force in an intentional, hostile and aggravated manner." (*Id.* at p. 297.)

The issue is not the legislative wisdom in seeking to exact a greater penalty in order to prevent physical harm (*In re Maston, supra*, 33 Cal.App.3d 559, 563), but whether minor and unsubstantial physical

---

[15]Statistical evidence presented during the presentencing hearing disclosed that based upon life expectancy projections, a 22-year-old male sentenced to life imprisonment without parole would serve a period of time nearly 5 times greater than the median term (10-1/4 years) upon conviction of first degree murder.

[16]The words "suffer" or "suffers" in conjunction with the statutory phrase bodily harm is, of course, used as a transitive verb synonymous with "endure" or "be subjected to." (Webster's Third New Internat. Dict.)

[17]Essentially similar definitions are currently employed defining "bodily" to include "physical, corporeal...or relating to the body," and the noun form of "harm" to include "physical or mental damage [or] injury." (Webster's Third New Internat. Dict.)

distresses, concededly associated with a significant degree of emotional suffering, constitute bodily harm consistent with the intended legislative purpose. Certainly had the Legislature intended a meaning far broader than commonly understood from the words used in order to include *any* form of harm, it was freely empowered to so declare. Since the Legislature has neglected to modify, expand or otherwise explicate the concept of "bodily harm" following the interpretations given in *Jackson* and its progeny, it is reasonable to conclude that such interpretations correctly reflect the legislative intention. (Cf. *People* v. *Caudillo, supra,* 21 Cal.3d at p. 578.)[18]

■ Courts may never substitute their will for that of the Legislature in the guise of statutory construction. However, it is within our province and remains our solemn duty to reasonably construe the statutory language in a manner calculated to effectuate the legislative purpose of enhancement and deterrence and in order to avoid absurd or unjust results. (*People* v. *Daniels, supra,* 71 Cal.2d at pp. 1130, 1139; see also *People* v. *Caudillo, supra,* 21 Cal.3d at p. 575; *Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 631 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420].)

■ In carrying out that duty, the conclusion is inescapable that the evidence of the injuries sustained does not constitute bodily harm within the meaning of Penal Code section 209 as a matter of law. Accordingly, the sentences·of life imprisonment without possibility of parole may not stand.

## II

*Postindictment Preliminary Hearing*

Defendants make the additional claim that the trial court's denial of a postindictment preliminary hearing constituted error. The claim is groundless. In announcing the new rule requiring a postindictment preliminary hearing upon timely request, the California Supreme Court expressly declared its prospective application only to those cases where the indicted defendant had not yet entered a plea. (*Hawkins* v. *Superior*

---

[18]We decline to engage in the semantical exercise suggested by the parties in rhetorically attempting to quantify the distinction between "bodily harm" and "great bodily injury" as discussed in *Caudillo (supra,* pp. 575-581, *passim*), in the context of unrelated enhancement statutes. In any case, the *Caudillo* discussion concerning bodily harm under section 209 is merely *dictum*, not stare decisis.

*Court* (1978) 22 Cal.3d 584, 594 [150 Cal.Rptr. 435, 586 P.2d 916].) Since all of the defendants entered pleas long before *Hawkins*, none were entitled to *Hawkins* relief and the motion was properly denied. (Cf. *Sherwood* v. *Superior Court* (1979) 24 Cal.3d 183, 186 [154 Cal.Rptr. 917, 593 P.2d 862].)

In view of the disposition we have reached herein, it is unnecessary to consider defendants' remaining constitutional challenges or other claims of error.

The judgment of conviction is modified by striking the findings of bodily harm and determination of parole ineligibility relating to counts three, five and seven; as so modified, the judgments of conviction and sentences of life imprisonment, and each of them, are affirmed.

NEWSOM, J.—I concur in the views so ably expressed in Justice Racanelli's opinion. I would like to add, if only by way of emphasis, my view of why the conclusion we reach is the only one possible under the circumstances.

The central question before us is one of law. It is a question easily framed. Were the injuries to the victims Brown, Heffington and Reynolds, "bodily harm" within Penal Code section 209, justifying the imposition on two defendants of the penalty of life without parole? In passing upon that question we are not, as the dissent suggests, reweighing evidence or in any fashion invading the province of the trier of fact; rather, we are assessing whether, accepting the facts the trier found to be true, that evidence as a legal proposition establishes the physical injuries required for the impositon of life without parole.

These injuries have been described elsewhere in detail; they consist of a nosebleed (caused the victim by a kick from another child), fainting spells, nausea and stomachache.[1]

The surrounding emotional distress inflicted on the victims, obviously immeasurably more painful and damaging than these physical injuries injuries, has, of course, (because the Legislature has decreed it to be so) *nothing whatever* to do with the determination of whether "bodily injury" occurred, although it was obviously, and mistakenly, the pivotal

---

[1]Abrasions of the knee and hand were found by the trial judge *not* to constitute "bodily harm."

point in the conclusions reached both by the trial judge and by my re-spected dissenting colleague.[2] If the Legislature had intended us to consider emotional distress and psychic damage in determining whether bodily harm occurred, it could—it can and possibly should—say so. So far, it has not. I therefore decline absolutely to consider such factors in weighing the bodily harm question. I say this of course fully recognizing that the infliction of mental or emotional distress may be so atrocious as to deserve far more severe penalties than mere infliction of minor physical injury.

The statute permitting imposition of life without parole, upon a find-ing of mental and emotional trauma unaccompanied by significant physical injury, remains then to be written. It is no part of our function, acting out of abhorrence when confronted with this atrocious crime, to substitute our notion of what the law should be for what it plainly is. As a great ninteenth century judge warned, "It is the province of the Judge to expound the law only—the written from statutes, the unwrit-ten...from the decisions of...predecessors and existing courts,... [and] not to speculate upon what is the best, in his opinion, for the ad-vantage of the Community."[3]

There are, as Justice Racanelli points out, sound pragmatic reasons why the Legislature has chosen not to permit the life without parole sentence where no independent significant physical harm occurs. (*People* v. *Daniels, supra*, 71 Cal.2d 1119; *People* v. *Jackson, supra*, 44 Cal.2d 511.) Manifestly the principal purpose was to provide an incen-tive for the kidnapper to refrain from inflicting such injury on the victim—a purpose which appears to have been vindicated in the circum-stances of this case.[4]

The sentences of life imprisonment are unquestionably warranted, but I agree that we are required as a matter of law to strike the imposi-

---

[2] With great respect for the learned trial judge—a jurist of experience and distinc-tion—"suffering" is not what the statute (Pen. Code, § 209) is "all about." The issue —to repeat—is whether substantial evidence of "bodily harm" as used in Penal Code section 209, and defined by our Supreme Court (cf. *People* v. *Daniels* (1969) 71 Cal.2d 1119 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677]; *People* v. *Jackson* (1955) 44 Cal.2d 511 [282 P.2d 898]), may be found in the evidence of this case, beyond a rea-sonable doubt.

[3] Chief Justice Coleridge in *Egerton* v. *Brownlow* (1854) 10 Eng.Rep. 359. As Bacon more succinctly puts it: "We are to declare, not make laws." (Essays LVI.)

[4] That this was found to be so by the trial court appears probable from the judge's statement at sentencing, ending with the following observation: "...those things have a tendency to indicate that the kidnappers were not simply completely indifferent to the welfare of the children."

tion of life without possibility of parole as clearly contrary to the legislative expression.

**ELKINGTON, J.**—I respectfully dissent from the opinions of my esteemed colleagues.

Our limited function is to determine whether, as a matter of law, the evidence that the kidnaped children were "subjected to bodily harm" was "substantial" or "insubstantial." My colleagues have found it to be "insubstantial."

The critical evidence is uncontroverted.

Many young and terrified school children on their way home in a school bus were, under threat of death or bodily injury by shooting, forced by defendants on a hot San Joaquin Valley summer afternoon into a tightly packed small van with about three and a half feet of headroom, and then into a pit consisting of a darkened and buried discarded furniture van. What we have variously, and aptly, described as the "nightmarish episode," "agony,"* "fright," "anxiety," and "terror" of the young children continued for 28 hours. A medical witness opined that the ordeal was exacerbated by "temperature problems" and overcrowding, "breathing difficulties," foul odor of body excreta, and fear of impending death.

During the course, and as a direct result, of this torment, some of the children, eight, nine and ten years of age, suffered abdominal pains, spontaneous nose bleeding, nausea, and fainting spells.

The trial court was persuaded *beyond a reasonable doubt* that the children had suffered *bodily harm* under Penal Code section 209. My colleagues conclude as a matter of law that they did not, for the reasons, among other things, that there was "no gross evidence" of significant injuries, that "trivial or insubstantial injury was not within the legislative contemplation in providing for the more serious penalty," and that "such harm as was sustained by all of the victims in common was not the result of the intentional or gratuitous infliction of force upon the victims. . . ."

---

*The "agony" is ascribed to the children's "families and friends" but the term will reasonably apply with greater force to the suffering of the children.

I think all would agree that, had defendants punched or kicked their young victims in their faces or abdomens, thus causing bloody noses and abdominal pains or other such trauma, they would have suffered bodily harm as intended by Penal Code section 209.

My mind rejects the argument that by inflicting such reasonably foreseeable injuries *indirectly* and by threat of death or bodily injury, under circumstances as here shown by the evidence, defendants' crimes were somehow mitigated. Nor am I able to find legal or other authority supportive of such an argument.

I would affirm in its entirety what I perceive to be the errorless judgment of the superior court.

Respondent's petition for a hearing by the Supreme Court was denied January 14, 1981. Richardson, J., was of the opinion that the petition should be granted.