95 Cal.Rptr.2d 178 (2000)
22 Cal.4th 872
997 P.2d 493
The PEOPLE, Plaintiff and Respondent,
v.
Tuan Van NGUYEN, Defendant and Appellant.
No. S072471.
Supreme Court of California.
May 4, 2000.
Rehearing Denied July 12, 2000.[*]
John L. Staley, under appointment by the Supreme Court, San Diego, for Defendant and Appellant.
Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Ronald A. Bass, Assistant Attorney General, Catherine A. Rivlin and Christina V. Kuo, Deputy Attorneys General, for Plaintiff and Respondent.
WERDEGAR, J.
Defendant Tuan Van Nguyen was convicted in 1997 of violating Penal Code[1] *179 section 209, subdivision (b), kidnapping for the purpose of robbery, otherwise known as aggravated kidnapping. We granted review and limited the issue on review to "whether the risk of harm required to elevate kidnapping to aggravated kidnapping may be a risk of psychological harm." (Italics added.) As explained below, we conclude the answer to this question is that it may.

FACTS
Julie Overacker rented a room in Thomas Savoca's house in San Jose. As she was unpacking her boxes, Tuan Van Nguyen (defendant) and Binh Nguyen (Binh) walked in. Binh pointed a gun at Savoca's head and ordered Overacker and Savoca to lie on the floor. Defendant ripped the telephone cord from the wall and used it to bind Savoca. Binh pointed the gun at Overacker and demanded money and jewelry. She complied. Not satisfied, Binh demanded more, pointing the gun at Overacker's temple. Overacker replied they could take anything in the house. She was led downstairs at gunpoint, at which time she noticed two additional men in the house. Three of the robbers went upstairs while Binh remained to guard Overacker. Overacker heard the three men looking through her belongings. Binh ordered her to close the blinds and turn off the lights. She complied. Binh then led Overacker back upstairs and placed her in a closet, while the robbers continued to rummage through the house. Binh announced the robbers would remove her from the house because she did not have anything they wanted. She offered her credit card. Binh declined, but asked whether she had an automatic teller machine (ATM) card. She said she did and was told to retrieve it. Binh also retrieved Savoca's ATM card, and both victims were made to reveal their personal identification numbers. The robbers then decided to leave Savoca tied up and take Overacker with them to a bank to use the ATM cards.
At this point the robbers had been in the house about 45 minutes. Binh, accompanied by defendant, led Overacker out of the house at gunpoint. She could see men carrying things out of the house and loading them into a car. Binh, defendant and Overacker got into Overacker's green Honda Accord, and the other two robbers followed in a brown hatchback. Once at the bank, Binh ordered Overacker to withdraw "all" her money. She withdrew $200 from the ATM, explaining to her assailants that withdrawals were limited to a daily maximum of $200. They returned to the house.
In the meantime, Savoca managed to free himself. He ran towards a neighbor's home, but hid when he saw Overacker's car return. When the robbers discovered Savoca was gone, they engaged in much shouting and quickly drove off, with Overacker still in the car. Binh told Overacker, "your boyfriend got away, he's very stupid, we told him we'd kill you."
Binh told Overacker to lie under the dashboard of the car and not look up and try to identify him or he would have her killed. She offered that Savoca had probably called the police so they should just let her go. Defendant initiated an animated discussion with his companions, apparently in Vietnamese, which Overacker took to mean he disagreed with her suggestion. They transferred their stolen goods from Overacker's car to the brown hatchback. Rather than release Overacker, however, the kidnappers forced her to the rear floor of the brown car while one of the robbers covered her eyes with his hands. They went to a convenience store, where the kidnappers engaged in another animated discussion. They eventually gave Overacker some juice and told her to drink it and go to sleep. Fearing the juice was drugged, Overacker pretended to drink and then feigned sleep.
The robbers then drove to a remote wooded area and told Overacker to wake up. Overacker believed they would kill her there. Instead, after another conversation *180 among themselves, the kidnappers told her they would wait until after midnight so they could use the ATM cards again, whereupon they would release her. After midnight, they drove in Overacker's green Honda Accord to a different bank, where Binh attempted to use the stolen ATM cards. San Jose Police Officer Tomlin observed the green Honda, obtained confirmation that it belonged to Overacker, and radioed for assistance while he followed the car. When he identified himself, two kidnappers exited the car and ran in opposite directions.
Because the initial report involved four kidnappers and the green Honda had tinted windows that prevented Officer Tomlin from seeing inside the car, he waited about 45 seconds to ensure no more people would emerge from the car. Satisfied, he approached the car and found it empty except for Overacker, who was lying in a fetal position on the floor. She was "[v]ery distraught ... crying, shaken." Officer Tomlin testified he "could hardly get her out of the car." He estimated it took "up to two minutes" to coax Overacker from the car.
Defendant was charged, among other felonies, with violating section 209, subdivision (b), kidnapping Overacker for purposes of robbery. In closing argument, the prosecutor spoke to the nature of the compelled movement of the victim: "Where [the movement] becomes more than slight, brief or trivial is where they take her out of her own house on Palm Sunday, put her in her car, and drive her down to [the bank] to go rob her. [¶] I would submit to you, ladies and gentlemen, that at that point you have got enough movement at about the time they are out of that house, getting close to the car. The rest is just icing on the cake in that regard. [¶] The movement substantially increased the risk of harm to the person moved over and above that necessarily present in the robbery itself. And that means that you rob a person in their house. Obviously they are in danger. But when you take a person out of their house at gunpoint, you can see by the facts we saw here what can happen. They drove her around for close to two hours. They took her up in the foothills, in the woods someplace. [¶] Does that increase the risk of injury? Of course it does. The risk of harm? Ask Julie Overacker where she comes to that. That's pretty simple and pretty straightforward. Again, movement in the house, I would submit to you that that's incidental to the robbery itself. Once you get out of that front door with the intent to go to the ATM, we have kidnap for robbery."
Regarding the aggravated kidnapping charge, the trial court delivered the following instruction: "Kidnapping is the unlawful movement by physical force of a person without that person's consent for a substantial distance where the movement is not merely incidental to the commission of the robbery and where the movement substantially increases the risk of harm to the person moved, over and above that necessarily present in the crime of robbery itself. [¶] Kidnapping is also the unlawful compulsion of another person without that person's consent and because of a reasonable apprehension of harm, to move for a substantial distance where such movement is not merely incidental to the commission of the robbery and where the movement substantially increases the risk of harm to the person moved, over and above that necessarily present in the crime of robbery itself. [¶] Brief movements to facilitate the crime of robbery are incidental to the commission of the robbery. [¶] On the other hand, movements to facilitate the robbery that are for a substantial distance ... are not incidental to the commission of the robbery. [¶] In order to prove this crime, each of the following elements must be proved: [¶] ... [¶] 5. The movement substantially increased the risk of harm to the person moved, over and above that necessarily present in the crime of robbery itself." (Italics added.)
*181 After it had retired to deliberate, the jury sent out a question, asking whether the "harm" referred to in the phrase "The movement substantially increased the risk of harm to the person moved" could include "psychological harm." The trial court gave this reply: "Webster's defines harm as physical or mental damage." The jury found petitioner guilty of aggravated kidnapping as well as the other charged felonies.

DISCUSSION
In light of the jury's question about psychological harm and the trial court's response, defendant contends the jury may have relied on his infliction of such nonphysical injury to convict him of aggravated kidnapping. Because he contends section 209 is limited to forced movements of the victim that substantially increase the risk of bodily or physical harm only, he argues we must reverse his conviction for aggravated kidnapping.
In 1995, at the time defendant committed his crime, section 209, subdivision (b) provided: "Any person who kidnaps or carries away any individual to commit robbery shall be punished by imprisonment in the state prison for life with possibility of parole." (Stats.1990, ch. 55, § 3, p. 394.) Although the statute at that time had no express requirement that movement of the victim substantially increase the risk of harm to the victim, we held in 1969 that implicit in the history of section 209 was a requirement thatin order to constitute an aggravated kidnappingthe movement (or asportation) of the victim (1) could not be incidental to the robbery, and (2) must "substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself." (People v. Daniels (1969) 71 Cal.2d 1119, 1139, 80 Cal.Rptr. 897, 459 P.2d 225 (Daniels); see generally People v. Rayford (1994) 9 Cal.4th 1, 14-19, 36 Cal.Rptr.2d 317, 884 P.2d 1369 [recounting the history of the Daniels rule].)
In 1997, the Legislature made this implicit requirement explicit, so that section 209, subdivision (b) now provides: "(1) Any person who kidnaps or carries away any individual to commit robbery [or other enumerated crimes] shall be punished by imprisonment in the state prison for life with possibility of parole. [¶] (2) This subdivision shall only apply if the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense." (§ 209, as amended by Stats.1997, ch. 817, § 2, italics added.)
The first step in our analysis is to examine the actual words of the statute, giving to them a commonsense meaning. (California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist. (1997) 14 Cal.4th 627, 633, 59 Cal.Rptr.2d 671, 927 P.2d 1175; Mercer v. Department of Motor Vehicles (1991) 53 Cal.3d 753, 763, 280 Cal.Rptr. 745, 809 P.2d 404.) As indicated, however, in 1995, at the time defendant committed his crime, section 209, subdivision (b) did not expressly require any type of harm. Considering the 1995 version of section 209, subdivision (b) together with Daniels, supra, 71 Cal.2d 1119, 80 Cal.Rptr. 897, 459 P.2d 225, is no more illuminating, for although Daniels interpreted the statute to require an increased risk of harm, it did not distinguish for that purpose between bodily and psychological harm. Nor did the 1997 amendment to section 209 clarify matters: the Legislature adopted and codified the Daniels rule, but the amended statute does not indicate on its face whether the harm required for an aggravated kidnapping embraces psychological harm or whether only physical or bodily harm will suffice.
Just as the actual words of the statute do not resolve this problem, an examination of post-Daniels case law is similarly unhelpful. Defendant relies on People v. Timmons (1971) 4 Cal.3d 411, 93 Cal.Rptr. 736, 482 P.2d 648 (Timmons). In Timmons, *182 we addressed whether a substantial increase in the risk of harm to the victims occurred when the defendants forced them to drive five blocks to effectuate their robbery. We concluded "this brief asportation may conceivably have increased the risk in some slight degree beyond that inherent in the commission of the robberies, but it cannot be said to have `substantially' increased that risk." (Id. at p. 416, 93 Cal.Rptr. 736, 482 P.2d 648, fn. omitted.) In reaching this conclusion, we described the rule in Daniels, supra, 71 Cal.2d 1119, 80 Cal.Rptr. 897, 459 P.2d 225, stating that when Daniels referred to a movement that "`substantially increased] the risk of harm,'" "we intended to refer to an increase in the risk that the victim may suffer significant physical injuries over and above those to which a victim of the underlying crime is normally exposed." (Timmons, supra, at p. 414, 93 Cal.Rptr. 736, 482 P.2d 648, italics added.) Subsequent opinions also spoke in terms of physical harm. (See, e.g., In re Earley (1975) 14 Cal.3d 122, 128, fn. 7, 120 Cal. Rptr. 881, 534 P.2d 721; People v. Stanworth (1974) 11 Cal.3d 588, 598, 114 Cal.Rptr. 250, 522 P.2d 1058, overruled on another ground in People v. Martinez (1999) 20 Cal.4th 225, 237, 83 Cal.Rptr.2d 533, 973 P.2d 512; People v. Milan (1973) 9 Cal.3d 185, 192-193, 107 Cal.Rptr. 68, 507 P.2d 956.) Defendant thus urges that Timmons suggests the risk to which Daniels refers is limited to a risk of physical injury.
By contrast, the People rely on People v. Laursen (1972) 8 Cal.3d 192, 104 Cal.Rptr. 425, 501 P.2d 1145 (Laursen). In that case, defendant Laursen and a companion committed an armed robbery and then fled the scene. When their getaway car failed to start, the robbers commandeered a car driven by Teeter, forcing him to drive them to a place of safety. Upon Laursen's conviction of kidnapping for robbery, he claimed on appeal that Teeter's kidnap, committed while Laursen had attempted to escape from the site of the robbery, did not come within the terms of the aggravated kidnapping statute because his intent to kidnap Teeter arose after the robbery had already begun. In rejecting that contention, we described the rule of Daniels, supra, 71 Cal.2d 1119, 80 Cal.Rptr. 897, 459 P.2d 225, noting, "the primary purpose of [section 209] is to impose harsher criminal sanctions to deter the carrying away of persons during the commission of a robbery in a manner which substantially increases the risk that someone will suffer grave bodily or psychic injury or even death." (Laursen, supra, at p. 198, 104 Cal.Rptr. 425, 501 P.2d 1145, italics added.) The People thus assert Laursen recognizes that the risk to which Daniels refers can include a risk of psychological injury.
Neither Timmons, supra, 4 Cal.3d 411, 93 Cal.Rptr. 736, 482 P.2d 648, nor Laursen, supra, 8 Cal.3d 192, 104 Cal.Rptr. 425, 501 P.2d 1145, addressed the precise question of whether a substantially increased risk of psychological injury, in the absence of a similarly increased risk of physical injury, can satisfy the Daniels test. Accordingly, any comment the cases made concerning the type of harm required by Daniels was unnecessary to their respective decisions and, thus, dicta. (Mercury Ins. Group v. Superior Court, (1998) 19 Cal.4th 332, 348, 79 Cal.Rptr.2d 308, 965 P.2d 1178 ["A decision, of course, is not authority for what it does not consider"]; In re Marriage of Cornejo (1996) 13 Cal.4th 381, 388, 53 Cal.Rptr.2d 81, 916 P.2d 476 ["`It is axiomatic that cases are not authority for propositions not considered.' (People v. Gilbert (1969) 1 Cal.3d 475, 482 fn. 7 [82 Cal.Rptr. 724, 462 P.2d 580],)" (Fn.omitted.)].)[2]
*183 To our knowledge, the question of psychological versus physical harm occurring in the context of aggravated kidnapping has specifically been addressed only once, still only in dictum. This was in the Court of Appeal's decision in the infamous Chowchilla kidnapping case. (People v. Schoenfeld (1980) 111 Cal.App.3d 671, 168 Cal.Rptr. 762 (Schoenfeld).) In that case, the three defendants confined the kidnapped bus driver and children in a van buried in a quarry. A hole had been cut in the roof of the van to allow ingress and egress, and holes had been cut in the fenders to serve as rudimentary toilets. Battery-powered fans supplied air through flexible hoses connected to four-inch holes cut into the walls of the van. Water and some food were provided. The kidnappers told the children they would stay in their underground prison for 24 to 48 hours. After all the victims had been lowered into the van, a steel plate was placed over the roof opening and weights were placed on it. Fortunately, through the heroic efforts of the bus driver and some of the older children, all the victims escaped with only minor physical injuries.
The defendants in Schoenfeld were charged with 27 counts of kidnapping for ransom and with five counts alleging the victims therein suffered "bodily harm." (Schoenfeld, supra, 111 Cal.App.3d at p. 675, 168 Cal.Rptr. 762; former § 209; see now § 209, subd. (a).) They pleaded guilty to kidnapping, but reserved the right to contest the disputed allegations of bodily harm in a bifurcated hearing before the court. After the hearing, the trial court found that three of the victims had suffered bodily harm; accordingly, the court sentenced the defendants to life in prison without possibility of parole on those three counts. On appeal, the Court of Appeal struck the findings of bodily harm and the related determination of parole ineligibility but otherwise affirmed.
In rejecting the trial court's determination of bodily injury, the Court of Appeal observed that, while every kidnapping for purposes of ransom necessarily involves some form of physical restraint, "it is the introduction of substantial bodily harm or injurynot the physical restraintwhich triggers the augmented penalty." (Schoenfeld, supra, 111 Cal.App.3d at p. 687, 168 Cal.Rptr. 762.) The court noted the evidence showed the victims suffered only minor physical ailments, such as scrapes, nosebleeds and stomachaches. None of these "transient physical distresses," the court concluded, "amounted to serious or substantial bodily injuries." (Ibid.)
Addressing the trial court's stated view that the total experience "constituted `an ordeal of terror, ... [which] ... causes suffering.... And suffering to me is what this statute is all about'" (Schoenfeld, supra, 111 Cal.App.3d at p. 680, 168 Cal. Rptr. 762), the Court of Appeal stated: "No rational person could doubt that the combined effect of such difficult and trying circumstances, together with the level of fear generated during the long hours of dark confinement, would cause all of the imprisoned victimsespecially the youngestto undergo great mental suffering or emotional harm implied in the findings below. But as the cases which have grappled with the amorphous concept of `bodily harm' in a variety of factual contexts teach[], something more than emotional trauma or mental or psychological harm, typically associated with all forms of involuntary restraint and confinement, is required in order to justify the harsher mandatory penalty ....
"Though it is debatable that no meaningful distinction exists in human terms between trauma-inflicted pain and suffering as opposed to fright-induced mental anxiety and emotional distress, the latter *184 is not the functional equivalent of a substantial bodily injury due to the application of a physical force beyond that necessarily involved in the forcible restraint itself. The trial court compounded its error in mechanically equating the statutory objective with any level or kind of `suffering.' But as discussed herein, it appears eminently more reasonable to conclude that all kidnapings involve some degree of suffering insofar as mental distress or emotional harm is relatively manifested. If, as the People contend, such evidence alone (with or without minor physical symptoms) is sufficient, then conceptually every forcible restraint and confinement would be automatically subject to the augmented penalty without the essential showing of substantial bodily injury. Such an unreasonable result would totally defeat the dual purpose of preventing physical harm to the victim and providing an added penalty for the more abhorrent criminal conduct. (People v. Jackson [(1955)] 44 Cal.2d [511,] 517 [282 P.2d 898].)" (Schoenfeld, supra, 111 Cal.App.3d at pp. 687-688, 168 Cal.Rptr. 762, italics in original, underscoring added, fns. omitted.)[3]
As may be seen, Schoenfeld is inapposite. Whereas in Schoenfeld the court was concerned with the express statutory requirement that, to render a defendant convicted of kidnapping for ransom ineligible for parole, the victim must have suffered serious "bodily harm" (Schoenfeld, supra, 111 Cal.App.3d at pp. 682, 685, 168 Cal. Rptr. 762), here we are dealing with the requirement that, for a kidnapping for robbery to qualify as an aggravated kidnapping, the asportation of the victim must substantially increase the "risk of harm" to the victim (Daniels, supra, 71 Cal.2d at p. 1139, 80 Cal.Rptr. 897, 459 P.2d 225). That the injuries to the victims in Schoenfeld did not qualify as "bodily harm" for purposes of the increased penalty has no bearing on whether the asportation of the victims increased their "risk of harm." Indeed, one could readily conclude the victims did suffer such increased risk of harm, both mental and physical (including, e.g., dehydration, starvation, suffocation, a cave-in, or physical injuries suffered while trying to escape). (See generally People v. Rayford supra, 9 Cal.4th at p. 13, 36 Cal.Rptr.2d 317, 884 P.2d 1369.) Accordingly, Schoenfeld is not authority for concluding the risk of harm requirement of section 209, subdivision (b) is limited to movement increasing the risk only of physical harm.
Just as an examination of precedent provides no definitive answer, scrutiny of the legislative evolution of section 209 does not reveal whether a risk of psychological harm is encompassed within the Daniels rule. Section 207, originally enacted in 1872, delineated what is today called "simple kidnapping" and merely restated the common law, which required that the victim be moved across county or state lines. (People v. Wein (1958) 50 Cal.2d 383, 414, 326 P.2d 457 (dis. opn. of Carter, J.), overruled in part by Daniels, supra, 71 Cal.2d 1119, 80 Cal.Rptr. 897, 459 P.2d 225; People v. Ordonez (1991) 226 Cal.App.3d 1207, 1225, 277 Cal.Rptr. 382 (Ordonez).) The first aggravated kidnapping statute, section 209, was enacted in 1901; it provided that one who "maliciously, forcibly, or fraudulently takes or entices away any person with intent to restrain such person and thereby to commit extortion or robbery, or exact from the relatives or friends of such person any money or valuable thing, is guilty of a felony, and shall be punished therefor by imprisonment in the state's prison for life, or any number of years not less than ten." (Stats.1901, ch. *185 83, § 1, p. 98; quoted in People v. Knowles (1950) 35 Cal.2d 175, 194, 217 P.2d 1 (dis. opn. of Edmonds, J.).) At that early time, the offense included no requirement that the individual kidnapped for robbery be harmed or endure the risk or threat of harm.
In the wake of the nation's heightened concern over kidnappings for ransom occasioned by the infamous abduction of the Lindbergh baby, this state in 1933 followed the enactment of the Federal Kidnaping Act (the so-called Lindbergh Law, 18 U.S.C. § 1201)[4] with an amendment to section 209. Twice amended in 1933, section 209 eventually read: "Every person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away any individual by any means whatsoever with intent to hold or detain, or who holds or detains, such individual for ransom, reward or to commit extortion or robbery or to exact from relatives or friends of such person any money or valuable thing, or who aids or abets any such act, is guilty of a felony and upon conviction thereof shall suffer death or shall be punished by imprisonment in the State prison for life without possibility of parole, at the discretion of the jury trying the same, in cases in which the person or persons subjected to such kidnaping suffers or suffer bodily harm or shall be punished by imprisonment in the State prison for life with possibility of parole in cases where such person or persons do not suffer bodily harm." (Stats. 1933, ch. 1025, § 1, pp. 2617-2618, italics added.)
As explained in Ordonez, supra, 226 Cal. App.3d at page 1226, 277 Cal.Rptr. 382: "The 1933 amendment omitted [as a requirement] the element of asportation which the Lindbergh Law had included, and it increased the penalty to death or life imprisonment without the possibility of parole if the victim suffered bodily harm. Thus, California law, like the federal law, tied the severity of the penalty to the harm suffered by the victim. `Both the federal and California Supreme Courts recognized the augmented penalty's purpose to deter the kidnaper from harming his victim, to induce him to release the victim unharmed.' (In re Maston (1973) 33 Cal. App.3d 559, 563 [109 Cal.Rptr. 164], citing Robinson v. United States (1945) 324 U.S. 282, 284 [65 S.Ct. 666, 89 L.Ed. 944]; People v. Jackson[, supra,] 44 Cal.2d 511, 517 [282 P.2d 898].)" (See also People v. Knowles, supra, 35 Cal.2d at p. 180, 217 P.2d 1 [discussing abandonment of the asportation requirement].)
In short, the 1933 amendment to section 209 changed the crime of aggravated kid *186 napping to include, for the first time, the concept of harm to the victim, linking that concept to the severity of the penalty. In so doing, the amendment spoke specifically of "bodily harm." (Stats.1933, ch. 1025, § 1, p. 2618.)
Section 209 was amended again in 1951 to reintroduce asportation as a requirement for kidnapping for robbery. (Stats. 1951, ch. 1749, § 1, p. 4167.) The Legislature, however, retained the previous statutory language making "bodily harm" a prerequisite for the death penalty (or life imprisonment without possibility of parole). (Ibid.)[5]
In 1973, the Legislature again amended section 209, this time providing for a mandatory death penalty in the event the victim died during an aggravated kidnapping. (Stats.1973, ch. 719, § 8, p. 1300; see generally Ordonez, supra, 226 Cal.App.3d at p. 1226 & fn. 10, 277 Cal.Rptr. 382.) As before, the Legislature retained the mandatory higher penalty of life imprisonment without parole in cases where the victim suffers "bodily harm." (Stats.1973, ch. 719, § 8, p. 1300.) (The Legislature subsequently abolished the mandatory death penalty for aggravated kidnapping resulting in death [Stats. 1977, ch. 316, § 15, p. 1262], instead making the death penalty merely permissive under those circumstances [former § 190.2, subd. (c)(3)(h); see Stats.1977, ch. 316, § 9, pp. 1257-1258].)
In 1976, as part of the reorganization and rewriting of penal statutes that resulted from the enactment of the Uniform Determinate Sentencing Act (Stats.1976, ch. 1139, § 350, p. 5175), section 209 was reconfigured, segregating the crime of kidnapping for ransom, extortion or reward into subdivision (a) of the section and that of kidnapping for robbery into subdivision (b). (Stats.1976, ch. 1139, § 136.5, p. 5099.) This division of crimes made sense because kidnapping for ransom, extortion or reward does not require the kidnappers forcibly to move the victim, whereas since the 1951 amendment to the statute, kidnapping for robbery has required such movement. (People v. Rayford supra, 9 Cal.4th at p. 12, fn. 8, 36 Cal.Rptr.2d 317, 884 P.2d 1369; Ordonez, supra, 226 Cal. App.3d at pp. 1226-1227, 277 Cal.Rptr. 382.)
For the section 209, subdivision (a) crimes (kidnapping for ransom, extortion or reward), the statutory language linking "bodily harm" with the higher penalty of life imprisonment without possibility of parole was retained. The new subdivision (b) of section 209, by contrast, made no reference to bodily harm, nor did it retain the increased penalty of life imprisonment without the possibility of parole. That subdivision merely stated: "Any person who kidnaps or carries away any individual to commit robbery shall be punished by imprisonment in the state prison for life with possibility of parole." (Stats.1976, ch. 1139, § 136.5, p. 5099.) In other words, by its terms the statute did not carry over to *187 the crime of kidnapping for robbery, now set forth in new section 209, subdivision (b), a linkage of "bodily harm" with an increased penalty.
The Legislature's failure, in new section 209, subdivision (b), to retain the concept of "bodily harm" in connection with the required asportation seems deliberate. In separating out kidnapping for robbery from kidnapping for ransom or extortion, the Legislature also eliminated any possibility of a sentence of life without parole for the former crime. Consequently, no justification appears for retaining, in the definition of "harm" for asportation, the requirement of section 209, subdivision (a) that only bodily harm would suffice. That is, that the Legislature has long provided greater punishment for aggravated kidnappers (or at least some aggravated kidnappers) who cause bodily harm to their victims does not necessarily mean the Legislature also intended to confine the asportation element of kidnapping for robbery to cases where the forced movement has increased the risk of physical injury, and to render irrelevant an increased risk of mental, emotional or psychological harm.
Rather, the more plausible conclusion is that when it separately criminalized the act of kidnapping to commit robbery, the Legislature intended to target coerced movement resulting in an increased risk either of grave physical injury or of mental terror. This conclusion is consistent with Daniels, supra, 71 Cal.2d 1119, 80 Cal.Rptr. 897, 459 P.2d 225. Although the Daniels court was concerned with the asportation element of kidnapping, it first discussed the element of bodily harm, proof of which was required for an enhanced penalty. In discussing the meaning of "bodily harm" for purposes of enhanced punishment, the court quoted People v. Tanner (1935) 3 Cal.2d 279, 297, 44 P.2d 324 to the effect that "bodily" pertains to the body: "`It is opposed to mental,'" whereas "harm" "`is defined as "hurt; injury; damage; (2) grief, pain, sorrow...."'" (Daniels, supra, at p. 1132, 80 Cal.Rptr. 897, 459 P.2d 225.) Although the Daniels court noted that in People v. Jackson, supra, 44 Cal.2d 511, 282 P.2d 898, we modified Tanner to require substantial bodily harm for purposes of an enhanced penalty (Daniels, supra, at p. 1133, 80 Cal.Rptr. 897, 459 P.2d 225), neither Jackson nor Daniels rejected the Tanner court's understanding of the meaning of "harm."
Having thus expressly recognized that the word "harm," standing alone, could include mental suffering, the Daniels court, in requiring a substantially increased risk of harm for the asportation element of kidnapping for the purpose of robbery, logically must have intended that requirement to be satisfied by a substantially increased risk of either physical or mental harm. Viewed in this light, substantial movement of a victim, by force or fear, which poses a substantial increase in the risk of psychological trauma to the victim beyond that to be expected from a stationary robbery, seems an entirely legitimate basis for finding a separate offense. To conclude the word "harm," as used in section 209, subdivision (b), includes psychological harm is thus reasonable.[6] Accordingly, the Court of Appeal *188 did not err in affirming defendant's conviction of kidnapping for robbery.[7]

CONCLUSION
The decision of the Court of Appeal is affirmed.
GEORGE, C.J., KENNARD, J., and BAXTER, J., concur.
Concurring and Dissenting Opinion by CHIN, J.
I disagree with the majority's conclusion that a substantially increased risk of psychological harm may establish the asportation requirement for defendant's conviction under Penal Code section 209, subdivision (b).[1] This conclusion is contrary to both the Legislature's intent and our prior decisions. Thus, I conclude the trial court erred in instructing the jury it could consider an increased risk of "mental damage."
However, I agree with the majority's conclusion that the instructional error was harmless. (Maj. opn., ante, at p. 188, fn. 7.) I therefore concur in the affirmance of defendant's conviction.

I. PEOPLE v. DANIELS

As the majority explains, before 1997, section 209 did not expressly specify as a requirement that the movement of the victim increased the risk of harm. We first announced this requirement in People v. Daniels (1969) 71 Cal.2d 1119, 80 Cal.Rptr. 897, 459 P.2d 225 (Daniels). There, we held that "the intent of the Legislature in amending ... section 209 in 1951 was to exclude from its reach not only `standstill' robberies [citation] but also those in which the movements of the victim are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself. (See Note, Room-to-Room Movement: A Risk Rationale for Aggravated Kidnaping (1959) 11 Stan.L.Rev. 554, 555; Note, A Rationale of the Law of Kidnaping (1953) Colum.L.Rev. 540, 554-557.)" (Daniels, supra, 71 Cal.2d at p. 1139, 80 Cal.Rptr. 897, 459 P.2d 225.)
Although our Daniels opinion does not speak clearly to the issue now before us, for two reasons I conclude that Daniels requires an increased risk of physical or bodily harm, and that an increased risk of only psychological harm is insufficient. First, the two law review articles we cited as authority for our holding support this conclusion. The sole focus of the first article is the history, construction, and application of section 209. (Note, Room-to-Room Movement: A Risk Rationale for Aggravated Kidnapping (1959) 11 Stan. L.Rev. 554 (hereafter Room-to-Room Movement).) The page of the article Daniels cites identifies the justification for section 209's harsh penalties as "a substantial risk of bodily harm" and "an express threat of death or great bodily injury." (Room-to-Room Movement, supra, 11 Stan. L.Rev. at p. 555, italics added.) Nowhere *189 on the cited page or anywhere else in the article is there even a reference to psychological harm. The second article considers the law of kidnapping generally, including the justification for making kidnapping a separate crime. (Note, A Rationale of the Law of Kidnapping (1953) 53 Colum. L.Rev. 540.) The portion of the article Daniels cites concludes by asserting that a separate kidnapping offense should be limited to kidnapping for ransom, which alone involves "conduct which ... is invariably of a highly dangerous order. In ransom kidnappings the means by which the victim is subjugated must almost inevitably be forcible; the victim must be subdued for a period of time sufficient to allow the defendant to demand and secure the ransom, and the accomplishment of the defendant's purpose involves at least a threat to harm or kill the captive." (Note, A Rationale of the Law of Kidnapping, supra, 53 Colum. L.Rev. at p. 557, italics added.) In context, the referenced "threat to harm" logically refers to a threat to inflict bodily harm, which is the kind of harm kidnappers threaten in order to accomplish their purpose, i.e., payment of ransom. Thus, our reliance in Daniels on these articles strongly suggests we were referring to an increased risk of only bodily harm.
Second, my conclusion is consistent with both the analysis in Daniels and the very existence of its "increased risk of harm" requirement In Daniels, we relied in part on People v. Jackson (1955) 44 Cal.2d 511, 282 P.2d 898 (Jackson). There, we refused broadly to construe the term "bodily harm," reasoning: "If the more serious penalty [under section 209] may be imposed when the only injury is of a nature similar to that shown by the present record, which concededly is almost necessarily an incident to every forcible kidnapping, neither the purpose of enhancement of the penalty for the more heinous crime nor the intention of deterring the kidnaper from killing or injuring his victim is subserved." (Jackson, supra, 44 Cal.2d at p. 517, 282 P.2d 898, italics added.) After quoting this passage, we explained in Daniels: "Just as we recognized in Jackson that some minor injuries are necessarily incidental to the crime of forcible kidnapping, so we now recognize that some brief movements are necessarily incidental to the crime of armed robbery. Indeed, `It is difficult to conceive a situation in which the victim of a robbery does not make some movement under the duress occasioned by force or fear.' [Citation.]" (Daniels, supra, 71 Cal.2d at p. 1134, 80 Cal.Rptr. 897, 459 P.2d 225.) Similarly, every movement that is not incidental to a robbery inflicts actual and significant emotional harm, unless the victim is unaware of or cannot understand what is happening. (See People v. Wolcott (1983) 34 Cal.3d 92, 1081, 192 Cal.Rptr. 748, 665 P.2d 520; People v. Schoenfeld (1980) 111 Cal.App.3d 671, 687, 168 Cal.Rptr. 762.) Thus, under the majority's interpretation, the second requirement Daniels announceda substantially increased risk of harmis effectively no requirement at all. The Daniels requirement only has meaning if it refers to the risk of bodily harm.[2]
I disagree with the majority that, having "expressly recognized" the word "harm" could include mental suffering, the Daniels court "logically must have intended" that the statutory requirement can "be satisfied by a substantially increased risk of either physical or mental harm." (Maj. opn., ante, 95 Cal.Rptr.2d at p. 187, 997 P.2d at p. 501, original italics.) For this conclusion, the majority relies on our quotation in Daniels of a passage from People v. Tanner (1935) 3 Cal.2d 279, 297, 44 P.2d 324 (Tanner), which stated in part: *190 "Harm is defined as `hurt; injury; damage; (2) grief, pain, sorrow; (3) evil; wrong; wickedness.' [Citation.]" (See maj. opn., ante, 95 Cal.Rptr.2d at p. 187, 997 P.2d at p. 501; Daniels, supra, 71 Cal.2d at p. 1132, 80 Cal.Rptr. 897, 459 P.2d 225.) However, Tanner addressed a completely different issue of section 209's construction: the meaning of the term "bodily harm" in the statute's punishment provision. (Tanner, supra, 3 Cal.2d at p. 297, 44 P.2d 324.) Moreover, in Daniels, soon after quoting what "[t]he court ... said" in Tanner, we explained that Jackson "reconsidered the matter" and concluded: "`[I]t is seriously questionable whether the definition in the Tanner case states the intention of the Legislature...."' (Daniels, supra, 71 Cal.2d at p. 1133, 80 Cal.Rptr. 897, 459 P.2d 225.) Thus, Daniels did not endorse the cited Tanner discussion, but cited its subsequent rejection in Jackson only to demonstrate that we may properly reconsider and overrule our prior cases interpreting section 209 despite legislative silence. (Daniels, supra, 71 Cal.2d at p. 1134, 80 Cal.Rptr. 897, 459 P.2d 225.) When we later held in Daniels that a substantially increased risk of harm is necessary for a section 209 conviction, we were not referring back to Tanner's definition of harm, which appeared much earlier in the Daniels opinion in an entirely unrelated discussion and which, as Daniels recognized, Jackson had rejected. Rather, as I have explained, we were referring to the risk of bodily harm discussed in the two law review articles we specifically cited in establishing this requirement.
Indeed, were the majority correct that we were referring to Tanner's subsequently rejected definition of harm, an increased risk of evil, wrong, wickedness, sorrow, or griefterms that also appeared in the quoted Tanner definition would be sufficient. I do not believe Daniels meant to construe section 209 so broadly. Moreover, it appears that the very source Tanner used to define the word "harm" indicated that the definition on which the majority reliesgrief, pain, sorrowwas obsolete, i.e., it had disappeared from current usage. (Webster's New Internat. Diet. (2d ed.1948) pp. xcv, 1139.) Thus, the Daniels passage the majority cites does not support its conclusion that a substantially increased risk of psychological harm is sufficient.

II. DECISIONS APPLYING DANIELS

According to the majority, our postDaniels cases are "unhelpful" in determining the issue in this case. (Maj. opn., ante, 95 Cal.Rptr.2d at p. 181, 997 P.2d at p. 496.) I disagree; our decisions actually applying Daniels to determine whether the evidence sustains a conviction under section 209 strongly support the conclusion that a substantially increased risk of psychological harm does not satisfy the second Daniels requirement.
Our first significant decision in this regard was People v. Timmons (1971) 4 Cal.3d 411, 93 Cal.Rptr. 736, 482 P.2d 648 (Timmons), which we decided only 15 months after Daniels. The sole issue in Timmons was whether the evidence showed that the defendant committed "conduct proscribed by ... section 209 as we construed it in Daniels." (Timmons, supra, 4 Cal.3d at p. 414, 93 Cal.Rptr. 736, 482 P.2d 648.) Applying the Daniels two-part test, we first found that the five-block movement of the defendant's victims "was `incidental to the commission of the robbery.' [Citation.]" (Timmons, supra, 4 Cal.3d at p. 414, 93 Cal.Rptr. 736, 482 P.2d 648.) Applying "the second branch of the Daniels test," we explained: "[W]e recognize that ... the movement of the car also increased the likelihood that the victims would be robbed. But that risk is not what we meant in Daniels [citation] when we spoke of movements which `substantially increase the risk of harm' beyond that inherent in the underlying crime. Rather, we intended to refer to an increase in the risk that the victim may suffer significant physical injuries over and above those to *191 which a victim of the underlying crime is normally exposed." (Timmons, supra, 4 Cal.3d at p. 414, 93 Cal.Rptr. 736, 482 P.2d 648, italics added, fn. omitted.) Applying this standard, we concluded in Timmons that the defendant's conduct did not meet the Daniels test. (Timmons, supra, 4 Cal.3d at pp. 415-416, 93 Cal.Rptr. 736, 482 P.2d 648.) We reached this conclusion even though the defendant moved his victims to "a place where it would be more difficult for them to raise an immediate alarm" and he could rob them "with less danger of detection" (id. at p. 414, 93 Cal.Rptr. 736, 482 P.2d 648), which surely substantially increased the risk they would suffer psychological harm.
In subsequent decisions, we have consistently applied Daniels as we did in Timmons, i.e., as requiring that the movement substantially increased the risk of physical harm. In People v. Beamon (1973) 8 Cal.3d 625, 636, 105 Cal.Rptr. 681, 504 P.2d 905, we rejected a challenge to the sufficiency of the evidence to sustain a section 209 conviction, explaining: "In People v. Timmons [citation] we stated that the Daniels risk-of-harm test referred `to an increase in the risk that the victim may suffer significant physical injuries over and above those to which the victim of the underlying crime is normally exposed.' [Citation.] There was present here by reason of the abduction a material increase in the risk that the victim would suffer significant physical injuries...." In People v. Milan (1973) 9 Cal.3d 185, 192, 107 Cal.Rptr. 68, 507 P.2d 956, we again quoted Timmons's statement that an increased risk of "`significant physical injuries'" is necessary for a section 209 conviction. We then affirmed the defendant's conviction because the asportation "gave rise to dangers, not inherent in robbery, that a traffic collision would occur and that as a result of the motion of the car the gun [held to the victim's head] would accidentally discharge." (People v. Milan, supra, 9 Cal.3d at p. 193, 107 Cal. Rptr. 68, 507 P.2d 956.) In In re Crumpton (1973) 9 Cal.3d 463, 467, 106 Cal.Rptr. 770, 507 P.2d 74, we overturned a section 209 conviction in part because the movement of the victim did not substantially increase the risk of "physical harm" or "physical assault." In People v. Stanworth (1974) 11 Cal.3d 588, 598, 114 Cal.Rptr. 250, 522 P.2d 1058, disapproved on another ground in People v. Martinez (1999) 20 Cal.4th 225, 237, 83 Cal.Rptr.2d 533, 973 P.2d 512 (Martinez), we reversed a conviction under section 209, applying the Timmons formulation of the Daniels test and finding "no evidence" the asportation "substantially increased the risk ... [the victim] would suffer physical harm." (11 Cal.3d at p. 598, 114 Cal.Rptr. 250, 522 P.2d 1058, italics added.)
In In re Earley (1975) 14 Cal.3d 122, 120 Cal.Rptr. 881, 534 P.2d 721 (Earley), we applied Daniels in considering a habeas corpus petition challenging the sufficiency of the evidence to sustain a section 209 conviction. We explained that in this context, the defendant could obtain relief only if "as a matter of law" his conduct did not violate section 209 "as construed" in Daniels. (Earley, supra, 14 Cal.3d at p. 125, 120 Cal.Rptr. 881, 534 P.2d 721.) Thus, we had "to consider the exact nature of the Daniels test." (Earley, supra, 14 Cal.3d at p. 126, 120 Cal.Rptr. 881, 534 P.2d 721.) As to the "increased risk of harm" requirement, we quoted Timmons in stating that this requirement "`refers to the risk created by the victim's movements that he will "suffer significant physical injuries over and above those to which a victim of the underlying crime is normally exposed"; ... [Citation.]' [Citation.]" (Earley, supra, 14 Cal.3d at p. 131, 120 Cal.Rptr. 881, 534 P.2d 721.) Applying this rule, we upheld the conviction, finding "that the asportation gave rise to dangers, not inherent in robbery, that an auto accident might occur or that the victim might attempt to escape from the moving car or be pushed therefrom by [the defendant]." (Earley, supra, 14 Cal.3d at p. 132, 120 Cal.Rptr. 881, 534 P.2d 721.) We also expressly endorsed both a 1973 CALJIC instruction that used the "`significant physical injuries'" *192 formulation (Earley, supra, 14 Cal.3d at p. 128, fn. 8, 120 Cal.Rptr. 881, 534 P.2d 721) and a statement from Justice Mosk's dissent in an earlier decision that the movement must "`substantially increase[] the risk of physical harm to the victim....'" (Id. at p. 128, fn. 7, 120 Cal.Rptr. 881, 534 P.2d 721 & accompanying text.)
Finally, in People v. Rayford (1994) 9 Cal.4th 1, 36 Cal.Rptr.2d 317, 884 P.2d 1369 (Rayford), we applied section 209's asportation requirement in an appeal from a conviction under section 208 for kidnapping with the intent to commit rape. We first held that section 209's asportation requirement governs in prosecutions under section 208. (Rayford, supra, 9 Cal.4th at pp. 20-21, 36 Cal.Rptr.2d 317, 884 P.2d 1369.) We then rejected the defendant's argument that the evidence failed to establish this requirement, stating: "The jury here applied the Daniels test to find that defendant moved [the victim] a `substantial distance' and that this movement `substantially increased' her risk of physical injury `over and above those to which such person is normally exposed in the commission of the crime of rape.' Applying the same test, we conclude that the evidence of asportation in this case was sufficient to support the kidnapping conviction." (Rayford, supra, 9 Cal.4th at p. 23, 36 Cal. Rptr.2d 317, 884 P.2d 1369, italics added.)
These decisions demonstrate that under Daniels, a substantially increased risk of physical harm is necessary to sustain defendant's section 209 conviction, and that a substantially increased risk of only psychological harm is insufficient. In each of them, we had to determine whether the evidence satisfied the Daniels requirements for a conviction under section 209 (or a statute incorporating its asportation requirement). In each of them, we specifically referred only to an increased risk of physical harm. In none of them did we look to the risk of psychological harm, even though doing so might have resulted in affirmance rather than reversal. Thus, the majority's conclusion is inconsistent with our subsequent construction and application of Daniels.
Although citing some (but not all) of these decisions, the majority, with little analysis, declines to follow them. Instead, the majority asserts that because Timmons did not address the "precise question" of whether a substantially increased risk of psychological harm is alone sufficient under Daniels, its unequivocal statement of the need for an increased risk of physical injury was "unnecessary ... and, thus, dicta." (Maj. opn., ante, 95 Cal. Rptr.2d at p. 182, 997 P.2d at p. 497.) Similarly, in a footnote, the majority summarily casts aside the other decisions I have cited, asserting that the question of physical versus psychological harm "was not posed" in them. (Maj. opn., ante, 95 Cal.Rptr.2d at p. 183, fn. 2, 997 P.2d at p. 497, fn. 2.)
The majority is incorrect. As I have explained, in Timmons and the other cited cases, we had to decide whether the evidence at trial actually established the Daniels requirement that the movement substantially increased the risk of harm. Were the risk of psychological injury relevant to this question, we certainly would have discussed that risk, especially before reversing convictions for insufficient evidence. But we never even mentioned the risk of psychological injury, and instead focused exclusively on the increased risk of physical harm. Thus, even were the majority correct that none of the decisions I have cited "directly mention[s] the point" we are considering here, each, "on its facts, necessarily stands as a direct authority on the question." (Bank of Italy etc. Assn. v. Bentley (1933) 217 Cal. 644, 650, 20 P.2d 940; see also Brown v. Kelly Broadcasting Co. (1989) 48 Cal.3d 711, 734-735, 257 Cal.Rptr. 708, 771 P.2d 406 ["`the language of an opinion must be construed with reference to the facts presented by the case, and the positive authority of a decision is coextensive only with such facts'"].) The majority, therefore, *193 errs in characterizing the statement in Timmons as dictum and in declining to follow Timmons and the other cases I have discussed.
Of course, even under the majority's mistaken view that our statement in Timmons was dictum, "it does not follow that" the statement should necessarily "be discarded." (San Joaquin etc. Irr. Co. v. Stanislaus (1908) 155 Cal. 21, 28, 99 P. 365.) We often follow dicta, especially dicta in which courts have "long acquiesce[d]." (In re Garner (1918) 179 Cal. 409, 411, 177 P. 162, disapproved on another ground in In re Lynch (1972) 8 Cal.3d 410, 424, fn. 15, 105 Cal.Rptr. 217, 503 P.2d 921.) The majority offers no persuasive reason for declining to follow our decisions that for almost 30 years have construed and applied Daniels to require a substantially increased risk of physical harm. Indeed, as I explain in this opinion, those decisions are, in fact, consistent with both Daniels and section 209's history. The majority's conclusion is consistent with neither.
The majority is correct, however, in declining to rely on People v. Laursen (1972) 8 Cal.3d 192, 104 Cal.Rptr. 425, 501 P.2d 1145 (Laursen), which the Attorney General cites. There, we stated: "In People v. Daniels [citation], we held `that the intent of the Legislature in amending ... section 209 in 1951 was to exclude from its reach not only "standstill" robberies [citation omitted] but also those in which the movements of the victim are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself.' [Citation.] Thus, the primary purpose of the statute is to impose harsher criminal sanctions to deter the carrying away of persons during the commission of a robbery in a manner which substantially increases the risk that someone will suffer grave bodily or psychic injury or even death." (Laursen, supra, 8 Cal.3d at p. 198, 104 Cal.Rptr. 425, 501 P.2d 1145.)
For several reasons, the Attorney General's reliance on Laursen is unpersuasive. First, as the majority correctly explains, the statement the Attorney General cites was unnecessary to the Laursen decision. (Maj. opn., ante, 95 Cal.Rptr.2d at p. 182, 997 P.2d at pp. 496-497.) The defendant in Laursen contended that for a section 209 violation, an intent to kidnap must exist before the robbery begins and the movement of the victim must occur before the robbery's completion. (Laursen, supra, 8 Cal.3d at p. 198, 104 Cal.Rptr. 425, 501 P.2d 1145.) To resolve this contention, we did not need to considerand, in fact, did not considerwhether an increased risk of psychological harm satisfies section 209's asportation requirement. In this crucial regard, Laursen is different from the cases I have discussed above, in which we had to determine whether the evidence satisfied section 209's asportation requirement. Second, Laursen offered no analysis for its statement about section 209's purpose; it analyzed neither Daniels nor the statute's legislative history. Third, other statements in Laursen support the conclusion that a substantially increased risk of psychological harm is not sufficient under Daniels to sustain a section 209 conviction. After concluding that section 209 applies to kidnappings committed to effect a robber's escape, Laursen cited "our holding[ ]" in Timmons with approval in stressing that the Daniels two-part asportation test applies to all section 209 prosecutions. (Laursen, supra, 8 Cal.3d at p. 200, 104 Cal.Rptr. 425, 501 P.2d 1145.) And, in explaining the "logic" of interpreting section 209 consistently with the law on felony murder, Laursen stated: "Through the imposition of harsher penalties, both seek to deter an aggravation of the risks to which persons involved in a robbery would otherwise be exposed. And to this extent both are reflections of the skeptical, though sensible, belief that a transgressor's intention to avoid physical injury at the time he embarks upon the ... robbery serves as no reasonable safeguard *194 that death or physical injury will not result before he finishes." (Laursen, supra, 8 Cal.3d at p. 200, fn. 6, 104 Gal. Rptr. 425, 501 P.2d 1145, italics added.) These considerations no doubt explain why in the almost 30 years since we decided Laursen we have never applied or even mentioned the statement the Attorney General now cites. Indeed, to the extent Laursen is relevant, it is, for the most part, consistent with my conclusion.

III. LEGISLATIVE HISTORY

As the majority explains, a 1933 amendment to section 209 linked the severity of punishment to whether the victim "suffer[ed] bodily harm." (Stats.1933, ch. 1025, § 1, p. 2618.) This linkage had a dual purpose: to recognize that the crime is more heinous and deserves a more severe penalty when a victim suffers bodily harm and to deter kidnappers from inflicting such harm. (Jackson, supra, 44 Cal.2d 511, 517, 282 P.2d 898.) The punishment for kidnapping for robbery remained linked to whether the victim "suffer[ed] bodily harm" until 1976, when the Legislature reorganized section 209, placed kidnapping for robbery in subdivision (b), and retained the linkage between punishment and "bodily harm" only for those crimes in subdivision (a). (Stats.1976, ch. 1139, § 136.5, p. 5099.) In 1997, the Legislature added a paragraph to subdivision (b) that provides: "This subdivision shall only apply if the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense." (§ 209, subd. (b)(2), added by Stats. 1997, ch. 817, § 2.)
For several reasons, this statutory evolution supports the conclusion that an increased risk of psychological harm does not satisfy section 209's asportation requirement. First, it provides the context for understanding Daniels. When we decided Daniels in 1969, the legislative focus of section 209 was, as it had been since 1933, preventing the infliction of bodily harm on the victim. Logically, when we held in Daniels that the Legislature intended section 209 to apply only where the movement "substantially increase[d] the risk of harm" (Daniels, supra, 71 Cal.2d at p. 1139, 80 Cal.Rptr. 897, 459 P.2d 225), we were referring only to bodily harm, which is the kind of harm the Legislature expressly designed the statute to prevent. Nothing in Daniels indicates we were using the word "harm" in any other sense. On the contrary, as I have explained, the second Daniels requirementa substantially increased risk of harmeffectively does not exist under the majority's interpretation of Daniels. As I have also explained, the definition on which the majority reliesgrief, pain, sorrowwas obsolete.
Second, in the 1997 legislation that added language to subdivision (b) similar to the Daniels test, the Legislature included an uncodified section declaring its "intent" that the Daniels "two-prong test of asportation ... be applied" to kidnapping for robbery prosecutions "pursuant to" our decision in Rayford, supra, 9 Cal.4th 1, 36 Cal.Rptr.2d 317, 884 P.2d 1369. (Stats. 1997, ch. 817, § 17.) This amendment "codifie[d] both Rayford" and "a modified version of the Daniels asportation standard. (Martinez, supra, 20 Cal.4th at p. 232, fn. 4, 83 Cal.Rptr.2d 533, 973 P.2d 512.) As I have explained, in Rayford, we used the following test in applying Daniels to determine the sufficiency of the evidence: whether "defendant moved [the victim] a `substantial distance'" and whether "this movement `substantially increased' her risk of physical injury...." (Rayford, supra, 9 Cal.4th at p. 23, 36 Cal.Rptr.2d 317, 884 P.2d 1369, italics added.) Thus, the relevant legislative history supports the conclusion that for conviction under section 209, subdivision (b), the movement of the victim must have increased the risk of bodily harm; an increased *195 risk of psychological harm is insufficient.
By contrast, the most the majority can say about section 209's history to support its conclusion is that the Legislature's decision to impose greater punishment on aggravated kidnappers who inflict bodily harm on their victims "does not necessarily mean" the Legislature intended to require an increased risk of only physical injury. (Maj. opn., ante, 95 Cal.Rptr.2d at p. 187, 997 P.2d at p. 501.) Arguably, the majority may be correct that the "bodily harm" requirement in section 209's punishment provision does not necessarily establish that an increased risk of psychological harm is insufficient. However, for the reasons I have discussed, it fully supports that conclusion. Moreover, the majority cites nothing in either the statute's history or our cases that supports its contrary view.
In summary, Daniels, our decisions applying it, and section 209's history all indicate that a substantially increased risk of only psychological harm cannot establish the asportation requirement for defendant's section 209 conviction. Thus, the trial court erred in instructing the jury it could consider an increased risk of "mental damage."

IV. HARMLESS ERROR

Although I conclude the trial court incorrectly instructed the jury, I agree with the majority that the error was harmless because the evidence demonstrates to a virtual certainty that the movement of the victim substantially increased the risk of bodily injury. (Maj. opn., ante, 95 Cal. Rptr.2d at pp. 187-188, fn. 7, 997 P.2d at pp. 501-502, fn. 7; see People v. Flood (1998) 18 Cal.4th 470, 76 Cal.Rptr.2d 180, 957 P.2d 869.) Accordingly, I concur in the affirmance of the Court of Appeal's judgment.
BROWN, J., concurs.
Dissenting Opinion by MOSK, J.
I dissent.
The superior court in this case instructed the jury that an element of kidnapping for robbery is that the victim suffered an increased risk of harm as a result of the movement. In response to a question from the jury whether the risk of harm included psychological harm, it instructed that "Webster's defines harm as physical or mental damage." The majority hold that the instruction was not erroneous because the risk of harm required under Penal Code section 209, subdivision (d), may involve "physical or mental harm." (Maj. opn., ante, 95 Cal.Rptr.2d at p. 187, 997 P.2d at p. 501.) I disagree. An increased risk of psychological injury will not satisfy the asportation element for the offense of aggravated kidnapping.
At the time defendant Tuan Van Nguyen committed the underlying offenses, Penal Code section 209, subdivision (b), provided that "[a]ny person who kidnaps or carries away any individual to commit robbery shall be punished by imprisonment in the state prison for life with possibility of parole." (Stats.1990, ch. 55, § 3, p. 394.) Under People v. Daniels (1969) 71 Cal.2d 1119, 1139, 80 Cal.Rptr. 897, 459 P.2d 225 (hereafter Daniels), the offense of aggravated kidnapping required more than merely incidental movement of the victim; the asportation of the victim must "substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself."[1]
*196 It is abundantly clear in Daniels, which I authored, that we assumed the increased risk of harm required under the statute was of physical injury. Daniels itself involved allegations that the kidnapping victims suffered bodily harm. Indeed, the version of Penal Code section 209 that we explicated in Daniels expressly applied only "`in cases in which the person ... subjected to such kidnapping suffers ... bodily harm.'" (Daniels, supra, 71 Cal.2d at p. 1125, 80 Cal.Rptr. 897, 459 P.2d 225, quoting former Pen.Code, § 209, Stats.1951, ch. 1749, § 1, p. 4167, italics added.)
Our analysis in Daniels addressed the risk of physical harm only. Thus, we pointed out, with regard to the "bodily harm" element under Penal Code section 209, that some minor physical injuries are necessarily incidental to the crime of forcible kidnapping, but, as we had earlier held in People v. Jackson (1955) 44 Cal.2d 511, 517, 282 P.2d 898), are not of the nature contemplated by the Legislature in providing a more serious penalty for an act of kidnapping that involves an increased risk of harm to the victim. (Daniels, supra, 71 Cal.2d at pp. 1133-1134, 80 Cal.Rptr. 897, 459 P.2d 225.) Jackson had explained that in the case of merely trivial physical injury, "neither the purpose of enhancement of the penalty for the more heinous crime nor the intention of deterring the kidnaper from killing or injuring [the] victim is subserved." (People v. Jackson, supra, 44 Cal.2d at p. 517, 282 P.2d 898.) By analogy, we construed the legislative intent with regard to the asportation element under Penal Code section 209 as excluding those "movements of the victim [that] are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself." (Daniels, supra, 71 Cal.2d at p. 1139, 80 Cal.Rptr. 897, 459 P.2d 225.)
At no point in Daniels did we discuss the psychological or emotional aspects of the physical movement. Significantly, we concluded that the victims in Daniels were not subjected to a substantial increase in "the risk of harm otherwise present" by the movements they were compelled to perform in furtherance of the robbery (Daniels, supra, 71 Cal.2d at p. 1140, 80 Cal.Rptr. 897, 459 P.2d 225), even though the evidence showed that they were moved at knifepoint or gunpoint and were "Madly frightened" and "distraught" (id. at p. 1123, 80 Cal.Rptr. 897, 459 P.2d 225).[2]
Viewed in context, nothing we said in Daniels can reasonably be understood to suggest that we meant anything other than increased risk of bodily harm. Had we intended to hold that the increased risk of harm element could be satisfied by a risk of merely psychological injury  a conclusion that would appear at odds with the "bodily harm" that had been a requirement under Penal Code section 209 for decades  we would have so stated expressly and unmistakably.
We subsequently explained in People v. Timmons (1971) 4 Cal.3d 411, 414, 93 Cal. Rptr. 736, 482 P.2d 648, that we intended in Daniels "to refer to an increase in the risk that the victim may suffer significant physical injuries over and above those to which a victim of the underlying crime is normally exposed." (Italics added.) We have repeatedly referred to physical injuries in describing the risk of harm factor under Daniels. (See, e.g., In re Earley (1975) 14 Cal.3d 122, 131, 120 Cal. Rptr. 881, 534 P.2d 721 [requirement under Daniels of increased risk of "`"significant physical injuries"'" to the victim]; People v. Stanworth (1974) 11 Cal.3d 588, *197 598, 114 Cal.Rptr. 250, 522 P.2d 1058 [no aggravated kidnapping when there was no increased risk that the victim "would suffer physical harm"]; People v. Milan (1973) 9 Cal.3d 185, 192-193, 107 Cal.Rptr. 68, 507 P.2d 956 [requiring an increased risk of physical harm]; see also People v. Thornton (1974) 11 Cal.3d 738, 771, 114 Cal.Rptr. 467, 523 P.2d 267 (cone. & dis. opn. of Mosk, J.) ["[W]e required in Daniels ... the jury must find that the movements ... substantially increased the risk of physical harm to the victim"]; People v. Lara (1974) 12 Cal.3d 903, 910, 117 Cal. Rptr. 549, 528 P.2d 365 (dis. opn. of Mosk, J.) [disagreeing with majority that the evidence showed "the substantial increase in the risk of serious physical harm to the victim required by Daniels"].)
Recently, People v. Rayford (1994) 9 Cal.4th 1, 23, 36 Cal.Rptr.2d 317, 884 P.2d 1369, described the Daniels test as requiring a substantial increase in the risk of physical injury. (See also id. at p. 24, 36 Cal.Rptr.2d 317, 884 P.2d 1369 (dis. opn. of Mosk, J.) [no evidence of substantially increased risk of harm because victim was not moved to a more secluded location, where there would be an increased risk "not only [of] rape, but also death"].) Similarly, People v. Martinez (1999) 20 Cal.4th 225, 236, 83 Cal.Rptr.2d 533, 973 P.2d 512 explained that "a primary reason forcible asportation is proscribed by the kidnapping statutes is the increase in the risk of harm to the victim because of the diminished likelihood of discovery, the opportunity for the commission of additional crimes, and the possibility of injury from foreseeable attempts to escape." These considerations all involve the increased risk of physical harm, not of psychological injury.[3]
Nor do I agree with the majority that the 1976 amendment of Penal Code section 209  which placed the offense of kidnapping to commit robbery in subdivision (b) (Stats.1976, ch. 1139, § 136.5, p. 5099)  was a "deliberate" expression of legislative intent to expand the risk of harm element to include psychological injury. (Maj. opn., ante, 95 Cal.Rptr.2d at p. 186, 997 P.2d at p. 500). The majority offer no persuasive support for such conclusion in the legislative history or elsewhere. The Legislature has repeatedly demonstrated that it knows how to deliberately include psychological harm in a statute. (See, e.g., Bus. & Prof.Code, § 4303 [referring to "serious bodily or serious psychological injury"]; Health & Saf.Code, § 24176, subd. (c) [referring to "substantial risk of serious injury, either bodily harm or psychological harm"]; Pen.Code, § 3508 [referring to "permanent physical or psychological injury"].) It did not do so here.
In my view, the requirement under Penal Code section 209, subdivision (b), must be understood in the context of our analysis in Daniels and of the statutory language, now in Penal Code section 209, subdivision (a), which has for decades spoken only of "bodily harm." We should also avoid a construction of the statute that threatens, as does the majority's, to undermine the statute's purpose of deterring kidnappers from harming their victims and inducing them to release the victim unharmed.
No doubt there is some risk of psychological harm in every criminal contact, however brief. It would appear that, in *198 future, virtually any act of kidnapping for the purpose of robbery may satisfy the requirement of a substantial (i.e., more than slight or trivial) increase in the risk of harm to the victim, even when there was no risk of physical injury. I cannot agree with the majority that the statute was intended to cast so wide a net.[4]
For these reasons, I dissent.
NOTES
[*] Mosk, J., Chin, J., and Brown, J., dissented.
[1] Unless otherwise indicated, all further statutory references are to the Penal Code.
[2] We disagree with the assertion in Justice Chin's concurring and dissenting opinion that decisions decided after Daniels "demonstrate that under Daniels, a substantially increased risk of physical harm is necessary to sustain defendant's section 209 conviction, and that a substantially increased risk of only psychological harm is insufficient." (Cone. & dis. opn. of Chin, J., post, 95 Cal.Rptr.2d at p. 192, 997 P.2d at p. 505, italics added.) Inasmuch as the question of physical versus psychological harm was not posed in any of the cases cited, none "demonstrate" that a substantially increased risk of psychological harm would be insufficient. At most, the cases hold that a substantially increased risk of physical harm would be sufficient to support a conviction under section 209.
[3] In response to the Schoenfeld decision, the Legislature added a provision to section 209 mandating a life sentence without possibility of parole for kidnappers who intentionally confine a victim "in a manner which exposes such person to a substantial likelihood of death." (Stats.1982, ch. 4, § 1, p. 4; see Review of Selected 1982 California Legislation (1983) 14 Pacific L.J. 601.)
[4] The federal act now provides in pertinent part: "(a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when [¶] (1) the person is willfully transported in interstate or foreign commerce, regardless of whether the person was alive when transported across a State boundary if the person was alive when the transportation began; [¶] (2) any such act against the person is done within the special maritime and territorial jurisdiction of the United States; [¶] (3) any such act against the person is done within the special aircraft jurisdiction of the United Stales as defined in section 46501 of title 49; [¶] (4) the person is a foreign official, an internationally protected person, or an official guest as those terms are defined in section 1116(b) of this title; or [¶] (5) the person is among those officers and employees described in section 1114 of this title and any such act against the person is done while the person is engaged in, or on account of, the performance of official duties; [¶] shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment. [¶] (b) With respect to subsection (a)(1), above, the failure to release the victim within twenty-four hours after he shall have been unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away shall create a rebuttable presumption that such person has been transported in interstate or foreign commerce. Notwithstanding the preceding sentence, the fact that the presumption under this section has not yet taken effect does not preclude a Federal investigation of a possible violation of this section before the 24hour period has ended. [¶] ... [¶] (d) Whoever attempts to violate subsection (a) shall be punished by imprisonment for not more than twenty years...." (18 U.S.C. § 1201.)
[5] Section 209, as it read following the 1951 amendment, provided: "Any person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away any individual by any means whatsoever with intent to hold or detain, or who holds or detains, such individual for ransom, reward or to commit extortion or to exact from relatives or friends of such person any money or valuable thing, or any person who kidnaps or carries away any individual to commit robbery, or any person who aids or abets any such act, is guilty of a felony and upon conviction thereof shall suffer death or shall be punished by imprisonment in the state prison for life without possibility of parole, at the discretion of the jury trying the same, in cases in which the person or persons subjected to such kidnaping suffers or suffer bodily harm or shall be punished by imprisonment in the state prison for life with possibility of parole in cases where such person or persons do not suffer bodily harm. [¶] Any person serving a sentence of imprisonment for life without possibility of parole following a conviction under this section as it read prior to the effective date of this act shall be eligible for a release on parole as if he had been sentenced to imprisonment for life with possibility of parole." (Stats.1951, ch. 1749, § 1, p. 4167, italics added.)
[6] Both separate opinions overstate the effect of our decision, arguing it unjustifiably broadens the scope of section 209. (Cone. & dis. opn. of Chin, J., post, 95 Cal.Rptr.2d at p. 189, 997 P.2d at p. 503 ["under the majority's interpretation, the second requirement Daniels announceda substantially increased risk of harmis effectively no requirement at all"]; dis. opn. of Mosk, J., post, 95 Cal. Rptr.2d at p. 197-198, 997 P.2d at p. 510-511 ["in future, virtually any act of kidnapping for the purpose of robbery may satisfy the requirement of a substantial ... increase in the risk of harm to the victim, even when there was no risk of physical injury"].) Daniels, of course, requires more than mere movement that poses a risk of psychological harm; rather, it requires that (a) the movement of the victim be more than incidental to the robbery, and (b) that movement substantially increase the risk of harm, over and above the risk inherent in a standstill robbery.
[7] Even were we to have concluded otherwise, that is, that the trial court erred in suggesting to the jury that a substantially increased risk of psychological harm satisfied section 209, subdivision (b), such "error" would be harmless. The facts of the case demonstrate to a virtual certainty that defendant's movement of Overacker substantially increased the risk to her of both physical and psychological harm. The record indicates Overacker was forcibly removed from her new home at gunpoint, driven against her will to her bank, then to a convenience store, then to an isolated place in the woods and, finally, to a second bank. Not only was she emotionally terrorized to the point of being physically paralyzed when she was rescued by Officer Tomlin, she was told to drink juice she believed to be poisoned and she reasonably believed her abductors took her to an isolated place in the woods to kill her. That she escaped relatively unscathed physically is beside the point; the evidence shows defendant moved her a substantial distance and that such movement substantially increased the risk to her of both psychological and physical harm. This, then, is not a case in which there was a risk to the victim of psychological, but not bodily, harm.
[1] All further statutory references are to the Penal Code.
[2] The majority correctly notes that Daniels required that the movement substantially increased the risk of harm. (Maj. opn., ante, 95 Cal.Rptr.2d at p. 187, fn. 6, 997 P.2d at p. 501, fn. 6.) However, since 1997, section 209 has expressly provided that it "only appl[ies]" if the movement is more than "merely incidental ... and increases the risk of harm...." (§ 209, subd. (b)(2).)
[1] Daniels found the risk of harm requirement implicit under an earlier version of the aggravated kidnapping statute. (Daniels, supra, 71 Cal.2d at p. 1139, 80 Cal.Rptr. 897, 459 P.2d 225.) In 1997, the Legislature expressly incorporated the rule in Daniels in amended Penal Code section 209. (Id., subd. (b)(2), as amended by Stats. 1997, ch. 817. § 2 ["This subdivision shall apply only if the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense." (Italics added.)]; see also Stats. 1997, ch. 817, § 17 [stating legislative intent to codify the Daniels test].)
[2] Although, as the majority point out (maj. opn., ante, 95 Cal.Rptr.2d at p. 187, 997 P.2d at p. 501), Daniels quoted an earlier case that cited the dictionary definition of the word "harm" as including "`"grief, pain, sorrow,"'" (Daniels, supra, 71 Cal.2d at p. 1132, 80 Cal.Rptr. 897, 459 P.2d 225, quoting People v. Tanner (1935) 3 Cal.2d 279, 297, 44 P.2d 324), we did not purport to state or imply that the increased risk of harm required for a conviction of aggravated kidnapping could be established by a showing that asportation increased the risk of psychological injury to the victim.
[3] The People point to dictum in People v. Laursen (1972) 8 Cal.3d 192, 198, 104 Cal. Rptr. 425, 501 P.2d 1145 that refers to the requirement under Penal Code section 209 as one involving "grave bodily or psychic injury." I agree with the majority that the reference, which was not supported by Daniels or followed in any of our numerous other cases in point, is not persuasive authority herein. (Maj. opn., ante. 95 Cal.Rptr.2d at p. 182, 997 P.2d at p. 497.) As explained in the text, the offense of aggravated kidnapping expressly required "bodily harm"; the reference to "psychic injury" in Laursen was obviously a misstatement. Significantly, until this case, no appellate court has held that the increased risk of psychological harm may satisfy the requirements for aggravated kidnapping until this case.
[4] The majority observe that even if they had concluded that the trial court erred, such error was harmless. I disagree that it appears beyond a reasonable doubt that the instructional error did not contribute to the verdict obtained. (See Neder v. United States (1999) 527 U.S. 1, 15, 119 S.Ct. 1827, 1837, 144 L.Ed.2d 35; see also People v. Flood (1998) 18 Cal.4th 470, 506, 76 Cal.Rptr.2d 180, 957 P.2d 869.)